ATTORNEY FOR PETITIONER:
**JOHN C. SLATTEN**
MARION COUNTY ASSESSOR'S OFFICE
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**PAUL M. JONES, JR.**
**MATTHEW J. EHINGER**
ICE MILLER, LLC
Indianapolis, IN

_____

# IN THE
# INDIANA TAX COURT

_____

|  |  |  |
|---|---|---|
| MARION COUNTY ASSESSOR, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Cause No. 49T10-1211-TA-00070 |
| | ) | |
| WASHINGTON SQUARE MALL, LLC, | ) | |
| DEBARTOLO REALTY PARTNERSHIP, | ) | |
| LP, and SIMON CAPITAL, LP, | ) | |
| | ) | |
| Respondents. | ) | |

FILED
Dec 30 2015, 11:23 am

CLERK
of the supreme court,
court of appeals and
tax court

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**December 30, 2015**

WENTWORTH, J.

The Marion County Assessor has challenged the Indiana Board of Tax Review's final determination that lowered the assessed value of the Washington Square Mall for each of the 2006 through 2010 assessment years. Upon review, the Court affirms in part and reverses in part.

**FACTS AND PROCEDURAL HISTORY**[1]

Constructed in the mid-1970's, Washington Square Mall ("Mall") is located on the east side of Indianapolis. The Mall, situated on approximately 72 acres, is comprised of an enclosed regional shopping mall and two junior anchor stores. (See, e.g., Cert. Admin. R. at 675, 1092-1149.) The Mall's listed owners are Washington Square Mall, LLC, DeBartolo Realty Partnership, LP, and Simon Capital, LP, all three of which are a part of the Simon Property Group (collectively, "Simon"). (See Cert. Admin. R. at 57, 63, 186-87, 675, 1092-1149, 1158, 2046.)

The Marion County Assessor valued the Mall at $32,865,400 for 2006, $28,034,200 for 2007, $28,051,300 for 2008, $28,054,000 for 2009, and $26,832,600 for 2010. (See, e.g., Cert. Admin. R. at 360-61 ¶¶ 16-19, 456, 1092-1149, 1808-10, 1879-80.) Believing those values to be too high, Simon filed appeals with the Marion County Property Tax Assessment Board of Appeals ("PTABOA"). While the PTABOA issued a determination that decreased the Mall's 2006 assessment to $29,528,800, it took no action on Simon's 2007 through 2010 appeals. (See, e.g., Cert. Admin. R. at 357-58 ¶¶ 2, 5, 360 ¶ 15.)

Simon subsequently challenged its assessments for each of the years at issue

---

[1] Portions of the administrative record are confidential; consequently, this opinion will only provide the information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

with the Indiana Board.[2]  In March of 2012, the Indiana Board conducted a consolidated hearing on Simon's appeals.

**The Indiana Board Hearing:  Simon's Evidence**

During the Indiana Board hearing, Simon presented a Summary Appraisal Report, completed in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP), that valued the Mall for each of the years at issue.  Simon also presented the testimony of Peter Korpacz, a member of both the Appraisal Institute (MAI) and the Counselors of Real Estate (CRE), who prepared the Summary Appraisal Report (the "Korpacz Appraisal").

Korpacz, who had appraised approximately 450 regional malls in 29 different states, testified that his primary assignment in valuing the Mall was to determine what an investor would be willing to pay to purchase the property.  (See Cert. Admin. R. at 1980-81, 2090-92.)  He identified several factors that would lead a potential buyer to perceive his investment in the Mall as high-risk, thus impacting what he would be willing to pay.  For instance, the Mall was suffering from a great deal of physical deterioration and deferred maintenance.  (See, e.g., Cert. Admin. R. at 1944 (indicating that the Mall's pavement was damaged), 2009-11 (indicating that the Mall's HVAC system was more than thirty years old), 2091 (explaining that the roof has leaked and caused interior damage).)  Additionally, the Mall's customer base had dwindled due to impeded access from U.S. Highway 40 and because there was competition from numerous other

---

[2] Indiana Code § 6-1.1-15-1 allowed Simon to pursue its 2007 through 2010 appeals with the Indiana Board without first receiving a final determination from the PTABOA.  See IND. CODE § 6-1.1-15-1(o)(1) (2011) (explaining that because the PTABOA failed to conduct a hearing on Simon's appeals within 180 days of their filing, Simon could appeal directly to the Indiana Board.)

3

retail facilities within fifteen miles of the Mall "with better quality tenants[.]" (See Cert. Admin. R. at 672, 691.) Finally, changes in the immediate area's demographics not only altered the Mall's tenant make-up from being fashion-oriented to discount-oriented, but also contributed to an overall poor occupancy rate. (See, e.g., Cert. Admin. R. at 686 (indicating that one of the junior anchors informed the Mall that it would be terminating its lease effective in 2011 due to poor retail sales), 1944-45, 2013-16 (indicating that the operating agreements for each of the three anchors had ended and that one of them, Macy's, left in 2008 citing underperformance[3]), 2019-33, 2043.) Given these factors, Korpacz surmised that the Mall ultimately would not sell to a "Simon-like" investor, but rather to a "well-heeled entrepreneur-speculator" who would likely redevelop the property for a different purpose. (See Cert. Admin. R. at 2230, 2247, 2268-69.)

To value the Mall, Korpacz first employed a sales comparison approach.[4] Under this approach, he examined the property data of numerous regional malls that sold throughout the country during each of the years at issue. (See Cert. Admin. R. at 694-98, 714-17, 724-28, 737-40, 749-52, 2050-56, 2232-34, 2245-48, 2316-18, 2331-32, 2347-48.) He then ranked these malls based on both their unadjusted sales prices per

---

[3] During all or a portion of the years at issue, the Mall was also anchored by three stores that were not owned by Simon: a Sears store, a Target store, and a Macy's store. (See Cert. Admin. R. at 675, 1158, 2006-07.)

[4] The sales comparison approach "estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market." 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (Manual) (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.)) at 3.

square foot and whether they were superior or inferior to the Mall.[5]  (See, e.g., Cert. Admin. R. at 696, 2053-54.)  In turn, Korpacz arrived at a per square foot value conclusion for the Mall for each of the years at issue by placing it "between the lowest superior [indication] and the highest inferior indication."  (See Cert. Admin. R. at 696, 716, 726, 739, 751, 2055.)  Based on this analysis, the Korpacz Appraisal presented the following overall values for the Mall under the sales comparison approach:

2006:  $12,000,000

2007:  $20,000,000

2008:  $16,500,000

2009:  $14,000,000

2010:  $14,000,000

(See Cert. Admin. R. at 643, 697, 714, 724, 737, 749.)

Korpacz also employed the income approach to value the Mall.[6]  Under this approach, Korpacz first determined an estimate of the Mall's net operating income:  he used market-based rental and occupancy rates but his operating expenses tracked both historical and management-budgeted performance.  (See, e.g., Cert. Admin. R. at 699-705, 2249-50.)  Korpacz concluded it was more appropriate to use market-based rental rates because using the actual contract rents – which were admittedly higher than his

---

[5] Korpacz explained that his determination whether a mall was superior or inferior to the Mall was based on an admittedly subjective analysis of data relating to retail sales per square foot, net operating income generated per square foot, types of trade areas, inline occupancy rates, physical condition and age of the structures, and types of anchors present.  (See, e.g., Cert. Admin. R. at 696, 2054.)

[6] The income approach, which "is used for income producing properties that are typically rented[, ] converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization."  Manual at 3.

market rate estimates – reflected a different economic reality (i.e., the 1990's, when those leases were signed, was a more economically robust period). (See, e.g., Cert. Admin. R. at 700 (stating he found support for this conclusion by comparing his market-rental rate estimates to the actual rental rates that were in place at Lafayette Square Mall, another Simon Mall located in Indianapolis, that suffered from similar issues (i.e., low occupancy rates, declining retail sales, and above average occupancy costs)), 2284-85.) Korpacz then analyzed investor surveys and comparable mall sales to determine what discount, terminal, and overall capitalization rates to apply against his net operating income estimates. (See, e.g., Cert. Admin. R. at 707-10.) The Korpacz Appraisal presented the following values for the Mall under the income approach:

| | Yield Capitalization Method | Direct Capitalization Method[7] |
|---|---|---|
| 2006: | $13,000,000 | $12,000,000 |
| 2007: | $15,000,000 | $14,000,000 |
| 2008: | $16,000,000 | $14,500,000 |
| 2009: | $11,500,000 | $10,500,000 |
| 2010: | $9,000,000 | $10,000,000. |

(See Cert. Admin. R. at 643, 712, 721, 734, 746, 758.)

Given that Korpacz determined three separate valuations for the Mall (one under the sales comparison approach and two under the income approach) for each of the years at issue, he reconciled them into a final value conclusion for each year. (See,

---

[7] In employing the income approach, the Korpacz Appraisal utilized both the yield capitalization and the direct capitalization methods. (See, e.g., Cert. Admin. R. at 639.) See also APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 491, 509, 529-30 (14th ed. 2013) (explaining that the former converts multiple years' income expectancies into one opinion of present value while the latter converts an estimate of a single year's income expectancy into an indication of value in one direct step).

e.g., Cert. Admin. R. at 643, 712.)  He then trended each of those reconciled values (except the one for assessment year 2010) back to January 1 of the prior year to reflect the appropriate valuation date for assessment purposes.  (Cert. Admin. R. at 712-13, 721-22, 734-35, 746-47, 758, 2048.)  See also 50 IND. ADMIN. CODE 21-3-3(b) (2006) (see http://www.in.gov/legislative/iac/) (indicating that prior to 2010, a property's March 1 assessment was to reflect a property's market value-in-use on January 1 of the preceding year) (repealed 2010); 50 IND. ADMIN. CODE 27-5-2(c) (2010) (see http://www.in.gov/legislative/iac/) (indicating that in 2010, property valuation and assessment dates were the same (i.e., March 1)).  Korpacz's final valuation estimates for the Mall were $12,250,000 for 2006, $14,200,000 for 2007, $14,900,000 for 2008, $12,000,000 for 2009, and $9,500,000 for 2010.  (See, e.g., Cert. Admin. R. at 643.)

**The Indiana Board Hearing:  The Assessor's Evidence**

During the Indiana Board hearing, the Assessor presented, among other things, a written review of the Korpacz Appraisal along with the testimony of its preparer, Will L. Stump  (the "Stump Appraisal Review").  Stump, also an MAI, testified that he had been appraising property for nearly 43 years and while his practice did not specialize in retail properties, he had appraised approximately four or five regional malls within the last ten years. (Cert. Admin. R. at 1824-26, 1887-88, 2180-82.)  He explained that he had been engaged by the Assessor to determine whether the valuations provided in the Korpacz Appraisal were "appropriate and reasonable" and if not, to provide his own valuations of the Mall.  (See Cert. Admin. R. at 1155.)

After reviewing the Korpacz Appraisal, Stump first explained that he disagreed with Korpacz regarding the amount of negative impact that several factors had on the

7

Mall's value. For instance, Stump inspected the property and found it well-maintained for its age. (Cert. Admin. R. at 1162, 1830-31 (concluding, as a result, that given the Mall's physical depreciation, the property should have been considered in "average to good" condition as opposed to Korpacz's belief that it was in "fair" condition).) Stump also stated that while Korpacz believed the Mall suffered because it had to compete with other nearby retail facilities, he believed that most of those other facilities were not comparable and therefore did not really compete with the Mall. (See Cert. Admin. R. at 1161-62, 1829-30.) Stump also disagreed with Korpacz's conclusion that the Mall's occupancy rate was poor; indeed, Stump found that during the years at issue, overall occupancy at the Mall actually increased from approximately 84% to 90%.[8] (See, e.g., Cert. Admin. R. at 1162, 1833-34.)

Next, Stump analyzed the Korpacz Appraisal's valuation approaches. With respect to the sales comparison approach, Stump did not believe that the properties Korpacz used were truly comparable to the Mall: none were located in Indiana and their occupancy levels and net operating income figures per square foot were much lower than those of the Mall. (See, e.g., Cert. Admin. R. at 1165-67, 1835-37.) Consequently, Stump performed his own sales comparison approach, utilizing data from the September 2005 through November 2008 sales of five retail properties located in Indiana and Illinois. (Cert. Admin. R. at 1183-85.) While these five properties were grocery-anchored strip centers and not regional malls, Stump maintained that they were more comparable to the Mall than the properties used by Korpacz because they were

---

[8] Korpacz had indicated that the Mall's occupancy ranged from 57% to 70%. (See Cert. Admin. R. at 686.) Korpacz's figures were lower than Stump's because they were based on inline occupancy only; Stump's figures included space occupied by anchors, junior anchors, and temporary tenants. (See, e.g., Cert. Admin. R. at 1210-11, 1833-34, 2019, 2052, 2177 (asserting that an investor would be interested in overall occupancy, not just inline occupancy).)

similar in age, they were remodeled at approximately the same time within their respective life spans, they were sold during the years at issue, and they all had similar occupancy rates. (See Cert. Admin. R. at 1184-85, 1933-37.) Based on the sales prices per square foot for these five properties, Stump concluded that during the years at issue the Mall would have sold for somewhere between $52 and $72 per square foot, or for a total of between $23,348,000 and $32,328,000. (Cert. Admin. R. at 1184-85.)

Stump also noted his disagreements with the value conclusions in Korpacz's income approaches. For example, he thought it was "unconscionable" to assume, as Korpacz had, that the Mall's actual (or contract) rents did not reflect market rents. (See Cert. Admin. R. at 1170, 1839-40 (contending that Simon, as "undoubtedly one of the most competent and experienced mall operators in the country," would have only negotiated market-based rents).) Moreover, Stump disagreed with the fact that Korpacz did not include as income any of the expense reimbursements received by the Mall during the years at issue for common area maintenance and real estate taxes.[9] (See, e.g., Cert. Admin. R. at 1169-70, 1837-39.) As a result, Stump asserted that Korpacz utilized net operating income figures in his income approaches that were too low.[10] (See Cert. Admin. R. at 1171.)

---

[9] When Korpacz estimated market rents to use in his income approaches, he assumed that all of the Mall's leases were, and would continue to be, gross leases. (See, e.g., Cert. Admin. R. at 702-03, 2066-69.) (See also Cert. Admin. R. at 2035, 2154-55 (explaining generally 1) the type of expenses that are considered to be for common area maintenance and 2) all the expenses of operating a property are covered by the landlord under a gross lease).) Stump, however, explained that under the leases in place during the years at issue, the Mall had actually recovered nearly 50% of its expenses. (See, e.g., Cert. Admin. R. at 1169-70, 1837-39, 2153-54, 2162.)

[10] Stump noted that for three of the assessment years at issue, Korpacz used total net operating income figures of $1,800,000 or less in his income approaches while Simon actually reported net operating income figures of between $2,600,000 and $3,400,000. (See Cert. Admin. R. at 1171.)

Stump also maintained that the capitalization rates Korpacz used in his income approaches were too high.[11]  For instance, Stump specifically noted that under his direct capitalization method, Korpacz used overall capitalization rates ranging from 14% to 16%, which he then loaded with another almost 3%.[12]  (See, e.g., Cert. Admin. R. at 643, 2366-67.)  Nonetheless, Stump explained that the investor surveys and comparable sales upon which Korpacz relied indicated that rates ranging from only 7% to 10.85% were appropriate.  (See, e.g., Cert. Admin. R. at 818-19, 2366-68.)

Given these disagreements, Stump performed his own income approach (direct capitalization method) to value the subject property during each of the years at issue.[13]  In calculating net operating income, Stump, unlike Korpacz, utilized the Mall's actual rents and expenses.  (See Cert. Admin. R. at 1171, 1177, 1180.)  Stump also included various expense reimbursements received by the Mall as income (e.g., common area maintenance recoveries and real estate taxes).  (See, e.g., Cert. Admin. R. at 1177, 1837-39.)  Stump then deducted for replacement reserves.  (See Cert. Admin. R. at 1179-80, 1845 (observing that while Simon had not deducted for replacement reserves, investors consider such a deduction appropriate).)  Then, based on the national investor

---

[11] Generally, the higher the capitalization rate used, the lower the resulting property value. (See, e.g., Cert. Admin. R. at 1846, 2081-82.)

[12] Because Korpacz assumed the Mall leases were gross leases, he excluded taxes from his calculation of net operating income (either as reimbursement revenue or as an operating expense) and then added (i.e., loaded) the effective tax rate to the capitalization rate.  (See, e.g., Cert. Admin. R. at 2084-86 (asserting that "when you put that into the cap rate and then you capitalize the net income without any consideration of tax revenue or expense, you are now reflecting in value the obligation for the landlord to pay a hundred percent of the taxes"), 2093-94, 2252, 2320-21.)

[13] Stump believed that Korpacz's use of the yield capitalization analysis, wherein he projected ten years' worth of income and expenses to 2016 was simply too speculative to be reliable. (See Cert. Admin. R. at 1171-72, 1181, 1843-44.)

surveys and his comparable sales, Stump applied capitalization rates ranging from 10.25% to 12%. (See Cert. Admin. R. at 1176, 1178, 1180.) In doing so, Stump estimated the Mall's value to be $22,015,000 for 2006, $32,150,000 for 2007, $24,000,000 for 2008, and $25,750,000 for 2009. (See Cert. Admin. R. at 1190, 1845-46, 1874.)

Stump did not offer a value of the Mall for the 2010 assessment. (See, e.g., Cert. Admin. R. at 1190, 2362.) Nevertheless, the Assessor presented a direct capitalization income approach performed by his deputy, Eve Beckman, a former Simon employee. (See, e.g., Cert. Admin. R. at 1483, 2149, 2152.) Beckman testified that in performing her approach, she essentially used Korpacz's data but made an adjustment to account for actual expense recoveries and then unloaded the capitalization rate. (Cert. Admin. R. at 1483, 2426-27.) Beckman arrived at a value of $17,000,000 for 2010. (Cert. Admin. R. at 1483.)

**The Indiana Board's Final Determination**

The Indiana Board issued its final determination on September 24, 2012. In it, the Indiana Board explained that because both Simon and the Assessor presented USPAP-compliant appraisals that valued the Mall as of the appropriate valuation dates, "both parties submitted evidence sufficient to raise a prima facie case[.]" (Cert. Admin. R. at 390 ¶ 27.) As a result, the Indiana Board found that it simply needed to weigh the competing appraisals and determine which one was more persuasive. (See Cert. Admin. R. at 390-91 ¶ 27.)

After analyzing each of the parties' sales comparison approaches, the Indiana Board found Korpacz's to be more persuasive than that of Stump's. Indeed, it stated

11

that Korpacz's analysis was reasonable, as it "was based on timely sales of regional malls deemed comparable to the subject property that were qualitatively adjusted to determine the likely sale price in terms of a price per square foot for the [Mall]." (Cert. Admin. R. at 394-95 ¶ 37.) The Indiana Board was further persuaded by the fact that Korpacz refined his sales comparison values "by graphing each [comparable] property's sales price with its net operating income per square foot of gross leasable area." (Cert. Admin. R. at 395 ¶ 37.) (See also Cert. Admin. R. at 695-98, 715-717, 725-728, 738-40, 750-52, 2055-56.)

In contrast, the Indiana Board explained that it could not give much weight to Stump's analysis because he not only utilized the sales of non-comparable properties (i.e., grocery store-anchored retail centers), but also failed to make any adjustments to account for that difference. (See Cert. Admin. R. at 394 ¶ 36, 395 ¶ 38.) Moreover, the Indiana Board continued, Stump failed to calculate a specific value under the sales comparison approach for any of the years at issue; rather, he merely calculated a "range of values" that were only used to substantiate his valuation under the income approach. (See Cert. Admin. R. at 394 ¶ 36, 395 ¶ 38.)

With respect to the parties' income approaches, however, the Indiana Board acknowledged that determining which one was more persuasive was "difficult." (Cert. Admin. R. at 395 ¶ 39.) In resolving the issue, its entire analysis states:

> [Korpacz] used capitalization rates that were not supported by his evidence and he made income and expense assumptions that seemed designed to value the property at the lowest possible rate. [Stump], however, made no attempt to account for the prevalence of long term leases at rents that no longer represented the market rate[s] at the property. In addition, [Stump's] approach relied upon the sale of properties that were not comparable to the subject property to develop a capitalization rate. Because of the lengthy and

12

detailed explanations that [] Korpacz provided for each of his assumptions and the lack of explanation that [] Stump gave for his analysis, the Board therefore gives more weight to [Korpacz's] income analysis.

(Cert. Admin. R. at 395 ¶ 39 (footnote omitted).)

Based on its determinations, the Indiana Board reduced the Mall's assessments in accordance with the reconciled values provided in the Korpacz Appraisal. More specifically, the Indiana Board ordered that the Mall be valued at $12,250,000 for 2006, $14,200,000 for 2007, $14,900,000 for 2008, $12,000,000 for 2009, and $9,500,000 for 2010. (Cert. Admin. R. at 397 ¶ 42.)

The Assessor initiated this original tax appeal on November 5, 2012. The Court conducted oral argument on August 29, 2013. Additional facts will be supplied when necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2015).

13

**ANALYSIS**

On appeal, the Assessor argues that the Indiana Board erred in adopting the Mall values provided in the Korpacz Appraisal for two reasons. First, the Assessor contends that the Indiana Board's determination that the Korpacz Appraisal was probative as to the Mall's value is contrary to law because it did not value the Mall in accordance with Indiana's market value-in-use assessment standard. (See Pet'r Br. at 5-6.) Alternatively, the Assessor asserts that the Indiana Board's factual findings were not supported by the evidence and it therefore abused its discretion when it determined that the Korpacz Appraisal was probative as to the Mall's value despite several significant flaws. (See Pet'r Br. at 3-5.)

**I.**

The Assessor asserts that the Indiana Board's final determination is contrary to law because in adopting the values provided in the Korpacz Appraisal, it ignored the meaning of Indiana's assessment standard, "market value-in-use." (See Pet'r Br. at 5-6; Pet'r Reply Br. at 9.) More specifically, the Assessor explains that the Korpacz Appraisal valued the Mall based on what a speculator, who would have to find a new focus for the Mall's use, would likely pay to purchase the property. (See Pet'r Br. at 5-6.) Consequently, the Assessor contends that the Korpacz Appraisal failed to value the Mall in relation to its market value-in-use, i.e., the value to its "current owner or similar user." (See Pet'r Reply Br. at 9 (arguing that the market value-in-use of the Mall "is not the value for a different use to a dissimilar user[; Simon] is not a speculator and [] does not try to find a new focus for the use of its properties" (citation omitted)).)

14

Indiana assesses property on the basis of its market value-in-use. See IND. CODE § 6-1.1-31-6(c) (2006); 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (Manual) (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.)) at 2. Market value-in-use is defined as the value of a property "for its current use, as reflected by the utility received by the owner or a similar user, from the property." Manual at 2. As this Court has previously explained, "market value-in-use, as determined by objectively verifiable market data, is the value of a property for its use, not the value of its use." Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 501 (Ind. Tax Ct. 2010) (citation omitted).

In light of this standard, the Court has repeatedly rejected the contention that the Assessor makes in this case: that a property's market value-in-use can only be measured in relation to other identical users and not in relation to participants within the commercial/retail market generally. See generally Shelby Cnty. Assessor v. CVS Pharmacy, Inc. #6637-02, 994 N.E.2d 350, 354 (Ind. Tax Ct. 2013) (observing that a CVS store's market value-in-use was properly measured in relation to participants in the commercial/retail market generally, and not solely to other CVS stores); Meijer Stores Ltd. P'ship v. Smith, 926 N.E.2d 1134, 1137 (Ind. Tax Ct. 2010) (recognizing that the market value-in-use of a property should be measured against properties with a comparable use as opposed to properties with identical users).

Korpacz believed that any knowledgeable purchaser would purchase the property not with the intent to continue operating it as a regional mall, but rather with the intent to find a new, more profitable retail purpose for the property, most likely as a discount mall or center. (See, e.g., Cert. Admin. R. at 691, 1944-47, 2005-06, 2013-14,

15

2032-33, 2043, 2091-92, 2230-32, 2268-70.) While this use is not identical to Simon's, it is, for purposes of market value-in-use, a similar use. See CVS, 994 N.E.2d at 354; Stinson, 923 N.E.2d at 502; Meijer, 926 N.E.2d at 1137. See also, e.g., BLACK'S LAW DICTIONARY 1529 (9th ed. 2009) (defining a speculator merely as "[a] knowledgeable, aggressive investor"). Accordingly, the Court will not reverse the Indiana Board's final determination on the basis that in adopting the values provided in the Korpacz Appraisal, the Indiana Board failed to value the Mall in relation to its market value-in-use.

## II.

Next, the Assessor claims that the Indiana Board abused its discretion because its final determination is not supported by substantial evidence. Specifically, the Assessor complains that:

1) the Indiana Board acknowledged in its final determination that the Korpacz Appraisal contained significant flaws;

2) those flaws rendered the Korpacz Appraisal unreliable;

3) an unreliable appraisal is not probative evidence; and

4) because Simon presented an appraisal that was not probative, the Indiana Board should have determined that Simon failed to

16

satisfy its burden of persuasion and ultimately, its burden of proof.[14]

(See Pet'r Br. at 3-5.)

The Assessor's argument invites this Court to reweigh evidence; that task, however, is not within this Court's prerogative on appeal absent an abuse of discretion. See Stinson, 923 N.E.2d at 498-99. To demonstrate an abuse of discretion, the Assessor must show that the Indiana Board's final determination is clearly against the logic and effect of the facts and circumstances before it. See Hubler Realty Co. v. Hendricks Cnty. Assessor, 938 N.E.2d 311, 315 n.5 (Ind. Tax Ct. 2010).

**A.**

On appeal, the Assessor points out that the Indiana Board, in its final determination, stated that Korpacz, in completing his sales comparison approach for 2008, manipulated his data to the point that he was "'cherry-picking' . . . to achieve a specific value." (See Pet'r Br. at 5; Cert. Admin. R. at 391 ¶ 28.) This flaw, the

---

[14] The term "burden of proof" incorporates both the burden of persuasion and the burden of production. See Porter Mem'l Hosp. v. Malak, 484 N.E.2d 54, 58 (Ind. Ct. App. 1985), trans. denied. The burden of persuasion is "[a] party's duty to convince the fact-finder to view the facts in a way that favors that party." BLACK'S LAW DICTIONARY 223 (9th ed. 2009). The burden of production, however, is "[a] party's duty to introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against [it] in a peremptory ruling[.]" Id. While the burden of persuasion never shifts, the burden of production may shift between parties during the course of litigation. See, e.g., Peabody Coal Co. v. Ralston, 578 N.E.2d 751, 753-54 (Ind. Ct. App. 1991).

The Assessor admits that the Korpacz Appraisal was, at first blush, sufficient to demonstrate that the Mall's assessments were incorrect. (See Pet'r Br. at 4.) As a result, the burden of production (i.e., the burden to go forward with evidence) then shifted from Simon to the Assessor. (Pet'r Reply Br. 4.) The Assessor maintains, however, that his evidentiary presentation successfully impeached the probative value of the Korpacz Appraisal and that the Indiana Board's final determination clearly reflects that. (See Pet'r Reply Br. at 5-8.) He complains that the Indiana Board abused its discretion when it nonetheless proceeded to reduce the Mall's assessed values to reflect those values specified in the Korpacz Appraisal. (See Pet'r Br. at 5 (asserting that the Indiana Board's findings of fact do not support its final determination and that the logical result would have been to completely disregard the values in the Korpacz Appraisal).)

17

Assessor contends, rendered the Korpacz Appraisal unreliable and therefore non-probative.

The Assessor is incorrect on this point. Most appraisals presented to the Indiana Board have offered opinions of value by at least two of the three commonly accepted property valuation approaches. See, e.g., Kooshtard Prop. I, LLC v. Monroe Cnty. Assessor, 38 N.E.3d 750, 752 (Ind. Tax Ct. 2015); Stinson, 923 N.E.2d at 499 n.4; Meijer, 926 N.E.2d at 1135. When there is a flaw or error in one approach, however, the entire appraisal is not rendered per se invalid. See, e.g., Marion Cnty. Assessor v. Gateway Arthur, Inc., Case No. 49T10-1212-TA-00081, 2015 WL 5734428, at *1, *5 (Ind. Tax Ct. Sept. 30, 2015).

Having said that, the Court finds that the Indiana Board nonetheless abused its discretion when it did not reject Korpacz's 2008 value estimate for the Mall under the sales comparison approach. The administrative record reveals that in performing his sales comparison approach for 2008, Korpacz relied on the sales data from eight comparable properties to arrive at a Mall value of approximately $57 per square foot (or more than $25,000,000 overall). (See, e.g., Cert. Admin. R. at 724-27, 2316-18.) Korpacz testified that because this value "didn't make sense," he removed several of the comparable sales from the pool, which ultimately brought his value estimate down to $37 per square foot (or $16,500,000 overall). (See, e.g., Cert. Admin. R. at 724-28, 2316-18.) While the Indiana Board found this adjustment appeared to be "cherry-picking," it determined that it would overlook the infirmity because 1) the adjustment affected his valuation for one year only and 2) sometimes an analysis does not always result in an accurate valuation. (See Cert. Admin. R. at 391 ¶ 28.) That determination,

18

however, was clearly against the logic and effect of the facts and circumstances before the Indiana Board.

In the world of property assessment, property values fluctuate annually with changes in the market. See Glass Wholesalers, Inc. v. State Bd. of Tax Comm'rs, 568 N.E.2d 1116, 1124 (Ind. Tax Ct. 1991) (explaining that each assessment and each tax year stands alone). Korpacz's sales comparison approaches for each of the five years at issue were the same: he analyzed the sales data of approximately eight regional malls, graded either a C+, C, or D, to determine a value for the Mall. (See Cert. Admin. R. at 695-96, 698, 715-17, 725-28, 738-40, 750-53.) Accordingly, one would reasonably conclude that Korpacz believed his process adequately captured the market fluctuations that impacted the Mall's valuation. But because he adjusted his process in 2008, it must be presumed that Korpacz did not believe his process adequately captured the market's fluctuations and their impact on the Mall's value for that year. Korpacz, however, failed to reveal the facts that supported his decision to deviate from his process. (See, e.g., Cert. Admin. R. at 724-728, 2316-19.)

The Court recognizes that "[t]he valuation of property is the formulation of an opinion; it is not an exact science." Stinson, 923 N.E.2d at 502. In order for an appraiser's opinion of value to be probative, however, it must be based upon facts. See, e.g., Lakes of Four Seasons Property Owners' Ass'n v. Dep't of Local Gov't Fin., 875 N.E.2d 833, 836 (Ind. Tax Ct. 2007), review denied. Indeed, if an appraiser has not identified the objective bases for his opinion, the Indiana Board has no way to assess whether the proffered opinion is rationally-based or merely a conclusion. See, e.g., id. (explaining that when the objective bases for an opinion of value are not provided to the

Indiana Board, the opinion of value is conclusory). Conclusory statements do not qualify as probative evidence. See Whitley Prods., Inc. v. State Bd. of Tax Comm'rs, 704 N.E.2d 1113, 1119 (Ind. Tax Ct. 1998), review denied.

**B.**

Next, the Assessor notes that the Indiana Board stated in its final determination that the capitalization rates Korpacz used in his income approaches were not supported by the evidence. (See Pet'r Br. at 5 (citing Cert. Admin. R. at 393 ¶ 33, 395 ¶ 39).) As a result, the Assessor contends that the Indiana Board should have rejected his income approaches because they were not probative.[15]

As previously explained, the income approach "converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." See note 6 (quoting Manual at 3). This conversion process therefore requires two inputs from an appraiser: 1) an estimate of net operating income (which accounts for a property's income and expenses) and 2) a capitalization rate.[16] Korpacz testified that of these two inputs, the choice of a capitalization rate is the more important one. (See Cert. Admin. R. at 2293 (indicating that unlike variations in a net operating income figure, even the slightest variations in a capitalization rate can result in large variations in a property's value).)

---

[15] The Assessor points out that the Indiana Board also noted flaws in how Korpacz determined his market rents and how he treated the Mall's expense reimbursements. (See Pet'r Br. at 5.) The Court need not address those flaws specifically, as its discussion regarding the capitalization rates issue is dispositive.

[16] A capitalization rate is extracted from market data; it is influenced by, among other things, the degree of perceived risk in the investment, market expectations of future inflation, and the rates of return earned by comparable properties in the past, and tax laws. See Hometowne Assocs. v. Maley, 839 N.E.2d 269, 275 (Ind. Tax Ct. 2005). See also generally Appraisal Institute, supra, at 491-99.

20

### 1. The Yield Capitalization Method

Korpacz relied on two nationally recognized investor surveys to determine what rates[17] to apply in his yield capitalization income approach. (See, e.g., Cert. Admin. R. at 707-08, 816-19.) Those surveys indicated the following range of rates were appropriate:

|        | Discount Rates | Terminal Rates |
|--------|----------------|----------------|
| 2006:  | 7% to 13.5%    | 6.5% to 10%    |
| 2007:  | 7% to 13.5%    | 6.5% to 10%    |
| 2008:  | 7% to 12.5%    | 6.0% to 11%    |
| 2009:  | 7% to 14.0%    | 6.0% to 13%    |
| 2010:  | 7% to 17.0%    | 6.25% to 13%   |

(See Cert. Admin. R. at 707, 714, 729, 741, 753, 818-19.) Korpacz, however, applied the following rates:

|        | Discount Rates | Terminal Rates |
|--------|----------------|----------------|
| 2006:  | 12%            | 13%            |
| 2007:  | 13%            | 14%            |
| 2008:  | 13%            | 14%            |
| 2009:  | 14%            | 15%            |
| 2010:  | 14%            | 15%            |

(See, e.g., Cert. Admin. R. at 643.) Korpacz asserted that given the Mall's issues with, among other things, its occupancy levels and below-average competitive quality, he believed it was reasonable to apply rates that were either at, or even above, the high

---

[17] Within the yield capitalization method, two separate rates are to be applied: a discount rate and a terminal capitalization rate. (See, e.g., Cert. Admin. R. at 707.) See also Appraisal Institute, supra, at 511 n.1, 517.

end of the ranges prescribed by the investor surveys. (See, e.g., Cert. Admin. R. at 707-08.)

## 2. The Direct Capitalization Method

With respect to determining what capitalization rate to apply in his direct capitalization income approach, Korpacz not only consulted the two investor surveys again, but also looked to the capitalization rates that were indicated through his analysis of several other comparable property sales. (See, e.g., Cert. Admin. R. at 708-10.) Those sources indicated the following rates (before an adjustment for a tax load) were appropriate:

|        | Investor Surveys | Comparable Sales |
|--------|------------------|------------------|
| 2006:  | 5.5% to 10%      | 12.37% to 18.93% |
| 2007:  | 5.5% to 12%      | 8.16%            |
| 2008:  | 5.8% to 15%      | 8.16% to 14.89%  |
| 2009:  | 6.0% to 12%      | 9.50% to 14.89%  |
| 2010:  | 6.0% to 11%      | 9.50% to 14.89%  |

(See Cert. Admin. R. at 708-09, 719, 730-31, 742-43, 755-56, 818-19.) Taking this into consideration, Korpacz applied the following rates (before his adjustment for the tax load) in his direct capitalization method of analysis:

|        | Overall Capitalization Rate |
|--------|------------------------------|
| 2006:  | 14%                          |
| 2007:  | 14%                          |
| 2008:  | 15%                          |
| 2009:  | 16%                          |

22

2010: 16%

(See, e.g., Cert. Admin. R. at 643.)

### 3. The Indiana Board's Findings

In its final determination, the Indiana Board found that Korpacz used capitalization rates that were higher than those indicated in the investor surveys and comparable sales data and, as a result, his rates were not supported by the evidence.[18] (See Cert. Admin. R. at 393 ¶ 33 and 395 ¶ 39.) The Indiana Board then ignored this finding and adopted all of Korpacz's values anyway, stating that Korpacz had provided "lengthy and detailed explanations . . . for each of his assumptions" whereas Stump had not. (See Cert. Admin. R. at 395 ¶ 39.) In doing so, the Indiana Board abused its discretion.

## CONCLUSION

The Indiana Board is Indiana's property valuation and assessment expert. Consequently, when the Indiana Board ascertains, as it did here, that parts of an appraisal are not probative, it should not then accept those parts of the appraisal to value the property.

The Indiana Board's final determination with respect to Issue I is AFFIRMED. With respect to Issue II, however, the Indiana Board's final determination is REVERSED and REMANDED with instructions to value the Mall in accordance with the probative parts of the Korpacz Appraisal:

> The Mall's 2006 assessed value should be $12,000,000, consistent with the value estimates contained in Korpacz's sales comparison approach and direct capitalization method income approach;

---

[18] This finding is not entirely accurate; the capitalization rates Korpacz used in his direct capitalization method for both 2006 and 2008 were within the ranges prescribed by the investor surveys and his comparable sales.

23

The Mall's 2007, 2009, and 2010 assessed values should be $20,000,000, $14,000,000, and $14,000,000 respectively, consistent with the value estimates contained in Korpacz's sales comparison approach;

The Mall's 2008 assessed value should be $14,500,000, consistent with the value estimate contained in Korpacz's direct capitalization method income approach.