

FILED
Jun 05 2024, 1:20 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR PETITIONER:
**AYN K. ENGLE**
ATTORNEY AT LAW
Indianapolis, IN

ATTORNEY FOR RESPONDENT:
**PAUL M. JONES**
JONES PYATT LAW, LLC
Greenwood, IN

# IN THE
# INDIANA TAX COURT

| | | |
|---|---|---|
| CLARK COUNTY ASSESSOR, | ) | |
| Petitioner, | ) | |
| v. | ) | Cause No. 22T-TA-00011 |
| DILLARD DEPARTMENT STORES, INC, | ) | |
| Respondent. | ) | |

### ON APPEAL FROM A FINAL DETERMINATION OF
### THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**June 5, 2024**

MCADAM, J.

The Clark County Assessor (the "Assessor") challenges the Indiana Board of Tax Review's (the "Indiana Board") final determination reducing the 2018 through 2020 assessments of Dillard Department Stores, Inc.'s ("Dillard") anchor department store in Clarksville, Indiana. The Assessor claims that the appraisal methodology used by Dillard's appraiser is inconsistent with generally recognized appraisal principles and inappropriately included intangible business value in the property valuation. The Assessor also contends that the final determination was unsupported by substantial

evidence because the appraisal the Indiana Board adopted was based on an arbitrarily chosen assumption. After reviewing each claim, the Court rejects the Assessor's challenge and affirms the Indiana Board's final determination.

## FACTS AND PROCEDURAL HISTORY

Dillard owns and operates a 204,500 square foot one-level retail anchor store sited on approximately thirteen acres of land at the Green Tree Mall in Clarksville, Indiana. The Assessor assigned the property an assessed value of $9,850,200 for tax year 2018, $9,925,500 for tax year 2019, and $9,766,900 for tax year 2020.

Dillard appealed those assessments first to the Clark County Property Tax Assessment Board of Appeals and then to the Indiana Board. During the Indiana Board hearing, Dillard and the Assessor presented competing appraisals prepared by professional appraisers valuing the subject property. Dillard's appraisal used the income and sales comparison approaches but did not develop a cost approach, believing that it would be time-consuming and would not accurately reflect the value of the property. That appraisal leaned most heavily on the income approach estimate and valued the property at $5,200,000 for 2018 and $5,110,000 for 2019 and 2020. In response, the Assessor submitted an appraisal using all three approaches. It gave the most weight to the cost and sales comparison approaches and valued the property at $10,773,000 for 2018, $10,500,000 for 2019, and $10,332,000 for 2020.

In its final determination, the Indiana Board expressed significant reservations about Dillard's sales comparison valuation estimate and all three of the Assessor's valuation estimates. It ultimately found Dillard's "income approach as a whole to be a reliable estimate of value," although it did express some concerns with the analysis. (*See* Cert. Admin. R. at 1172-73 ¶ 68.) The Indiana Board concluded by reversing the

2

Assessor's 2018 through 2020 assessments and adopting Dillard's appraisal values of $5,200,000 for 2018 and $5,110,000 for 2019 and 2020.

The Assessor then filed this appeal.[1]

## STANDARD OF REVIEW

The Court's review of Indiana Board decisions is governed by Indiana Code § 33-26-6-6, the provisions of which closely mirror those controlling the judicial review of administrative decisions governed by Indiana's Administrative Orders and Procedures Act ("AOPA"). *Compare* IND. CODE § 33-26-6-6(e) (2024) *with* IND. CODE § 4-21.5-5-14(d) (2024). Under Indiana Code § 33-26-6-6, the party seeking to overturn a final determination of the Indiana Board bears the burden of demonstrating its validity. I.C. § 33-26-6-6(b). The challenger must demonstrate that it has been prejudiced by a final determination of the Indiana Board that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. I.C. § 33-26-6-6(e)(1)-(5).

The Legislature has specifically designated the Indiana Board as the trier of fact, charged with determining the relevance and weight to be assigned to the evidence before it. *See* IND. CODE § 6-1.1-15-4(p) (2024). Like the review of administrative decisions subject to AOPA, this Court reviews legal conclusions *de novo* but affords

---

[1] The Dillard property includes three adjacent parcels. Dillard did not develop an appraisal valuation for one of the parcels, assessed at $174,400 for each year, and the Indiana Board did not adjust its value in the final determination. The values in this section exclude this parcel except for the valuations offered by the Assessor's appraiser as that appraisal did not provide a specific value for the parcel that can be deducted from the total. Further references to these values reflect only the assessments for the two parcels adjusted by the Indiana Board.

deference to the factual determinations of the Indiana Board if they are supported by substantial and reliable evidence. *See* I.C. § 33-26-6-6(e)(5); *Indiana Alcohol & Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 375 (Ind. 2017) (articulating the standard of review of administrative actions under AOPA); *Kellam v. Fountain Cnty. Assessor*, 999 N.E.2d 120, 122 (Ind. Tax Ct. 2013) (articulating the standard of review for Indiana Board decisions), *review denied*. The Court may not substitute its judgment for that of the Indiana Board by reweighing the evidence or reevaluating the credibility of witnesses. *See* IND. CODE § 33-26-6-3(b) (2024); *Kellam* 999 N.E.2d at 122.

**DISCUSSION AND DECISION**

The dispute in this case centers around the income approach estimate prepared by Dillard's appraiser to establish the value of its property. In its final determination, the Indiana Board determined that Dillard's income approach estimate was "the best evidence of value" for the subject property and adopted it as its own. (*See* Cert. Admin. R. at 1176, ¶78.) On appeal, the Assessor challenges the methodology employed by Dillard's appraiser to calculate the market rent used in preparing his income approach estimate.

The income approach converts an estimate of income (*e.g.*, rent) that a property is expected to produce into an estimated value of the property through a mathematical process known as capitalization. REAL PROPERTY ASSESSMENT MANUAL FOR 2011 ("Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (amended 2020)) at 2. Dillard's appraiser applied what he called the "percentage of sales method," to approximate the market rent for the subject property by reference to industry norms

4

regarding the ratio of rent-to-retail sales.[2] (*See* Cert. Admin. R. at 1218.) He found that similarly situated department stores typically agree to pay rent equal to 2% to 3% of their retail sales and concluded that a 2.5% ratio was appropriate for the property at issue in this case. (*See* Cert. Admin. R. at 240, 249-50.) He then applied that 2.5% ratio to a separately developed estimate of the expected retail sales for similarly situated anchor stores. (*See* Cert. Admin. R. at 240, 249-50.) This resulted in estimated market rents for the subject property of $2.50 per square foot for 2018 and $2.40 per square foot for 2019 and 2020.[3] (*See* Cert. Admin. R. at 250.)

The Assessor first contends that the "percentage of sales method" Dillard used in its income approach is not a generally recognized appraisal methodology. He then argues that the methodology, by relying on the level of retail sales, improperly includes intangible business value in the property value. He concludes by arguing that there was not substantial evidence to support the 2.5% ratio that Dillard ultimately selected to estimate the market rent for its income approach.

### Dillard's Use of the "Percentage of Sales Method"

Under Indiana law, real property is assessed according to its "true tax value." *See, e.g.*, IND. CODE § 6-1.1-1-3(a) (2018). The General Assembly has delegated the task of defining the term to the Department of Local Government Finance ("the

---

[2] Dillard's appraiser refers to the "percentage of sales method" in various ways throughout the record and briefing, including as the "stabilized retail sales method" and the "percentage of sales method". (*See* Cert. Admin. R. at 249, 1218.) The Court refers to the method as the "percentage of sales method" in this opinion.

[3] After calculating the market rent, Dillard's appraiser subtracted the permitted expenses to arrive at estimated net income and divided by the 8.5% capitalization rate. This produced its income approach valuations of $5,295,000 for 2018 and $5,110,000 for 2019 and 2020.

Department"), *see* IND. CODE § 6-1.1-31-6(f) (2018), which defines true tax value in its administrative regulations as "[t]he market value-in-use of a property for its current use, as reflected by the utility received by the owner or by a similar user, from the property." Manual at 2. The rules specify that the three standard appraisal methods (i.e., the cost approach, the sales comparison approach, and the income approach) may be "used to determine market value-in-use" and "shall be applied in accordance with generally recognized appraisal principles." Manual at 2. The rules point to "[s]tandard appraisal and valuation texts such as those published by the Appraisal Institute and the [International Association of Assessing Officers]" as "acceptable sources for determining such principles." Manual at 2.

The Assessor argues that the Indiana Board acted contrary to law in adopting Dillard's income approach appraisal because the "percentage of sales method" is not consistent with generally recognized appraisal principles. (*See* Pet'r Br. at 4.) However, whether something is consistent with generally recognized appraisal principles is necessarily a question of fact. *Walmart Stores, Inc.*, 513 P.3d 457, 476 (Kan. 2022) (noting that whether "an expert utilizes a legally accepted methodology to determine value" is a question to be determined by the factfinder). Such appraisal principles are not set forth in statute or regulation. Nor are they collected in a single source. Manual at 2 (acknowledging that there are multiple "texts" containing generally recognized appraisal principles). Moreover, recognized appraisal principles are not static but are dynamic and continually evolving. The Appraisal Foundation, 2024 Uniform Standards of Professional Appraisal Practice (USPAP) ("2024 USPAP Standards") at 18, available at

https://appraisalfoundation.sharefile.com/share/view/sa9a85f26098c4f7ab01e927b647e c962_) ("[T]he appraisal profession is constantly reviewing and revising appraisal methods and techniques and devising new methods and techniques to meet new circumstances.").

In this case, the Indiana Board determined that Dillard presented an appraisal compliant with the Uniform Standards of Professional Appraisal Practice.[4] Those standards require an appraiser developing a real estate appraisal to apply generally recognized appraisal practices. *See* 2024 USPAP Standards, Standards Rule 1-1(a) (requiring an appraiser to "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal") (emphasis omitted). The Assessor has not countered this contention or pointed to any legal or appraisal authority demonstrating that the "percentage of sales method" used by Dillard to derive its market rent estimate is not consistent with generally recognized appraisal principles. The Assessor should have introduced such evidence during the Indiana Board's proceedings. Accordingly, the Court is not persuaded that Dillard's use of the "percentage of sales method" is contrary to law as

---

[4] According to the Appraisal Foundation:

> The *Uniform Standards of Professional Appraisal Practice* (USPAP) is the generally recognized ethical and performance standards for the appraisal profession in the United States. USPAP was adopted by Congress in 1989, and contains standards for all types of appraisal services, including real estate, personal property, business and mass appraisal. Compliance is required for state-licensed and state-certified appraisers involved in federally-related real estate transactions.

The APPRAISAL FOUNDATION, What is USPAP?, available at https://www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/Uniform_Standards_of_Professional_Appraisal_Practice/TAF/USPAP.aspx?hkey=62c73d17-9bcf-42b3-a6e4-d4b4b72c098f (last visited June 4, 2024).

the Assessor has not shown that the method is inconsistent with generally recognized appraisal principles.

### *Potential Inclusion of Intangible Business Value*

The Assessor next urges the Court to overturn the Indiana Board's final determination, arguing that it is not in accordance with law because Dillard's income approach valuation improperly includes intangible business value. In Indiana, "true tax value" reflects the "value of a property *for* its use, not the value *of* its use" and generally excludes "business value, investment value, [and] the value of contractual rights[.]" *Howard Cnty. Assessor v. Kohl's Indiana LP*, 57 N.E.3d 913, 917 (Ind. Tax Ct. 2016), (citation and internal quotation marks omitted), *review denied*. Emphasizing this principle, the Assessor argues that the use of retail sales to derive market rent for the subject property by Dillard's appraiser invariably inserted intangible business value in the property valuation because retail sales vary according to the relative efficiency or inefficiency of the management of a store. (*See* Pet'r Br. at 12.) The Assessor concludes that it was unreasonable for the Indiana Board to accept Dillard's appraisal because the Board expressly acknowledged that the methodology includes "some risk of valuing the business[.]" (*See* Pet'r Br. at 15 (citation and internal quotation marks omitted).)

The Assessor's contentions, however, overlook the consideration Dillard's appraiser gave to the need to separate business value from the property value itself. He addressed the issue head on, noting:

> The value of an operating store consists of going concern value that *includes the real estate, the business value* and the personal property.

\* \* \* \* \*

8

It is important to recognize the distinction between these three elements *so that business value is not included in the real estate value* for an over performer, nor should the real estate value be penalized for abnormally low retail sales.

(Cert. Admin. R. at 241 (emphases added).)

The record reveals that Dillard's appraiser, aware of the risk of including intangible business value in his property valuation, took steps to mitigate it. He explained that he removed business value from his income estimate by using a weighted average of retail sales from the subject property, the other anchor stores located in the same mall, and anchor stores elsewhere in Indiana and the Midwest:

> In using this method, I have also considered the fact that its validity is based on the subject store having a typical level of retail sales when compared to the sales of the other anchors in the same area. If a particular store has sales levels that are substantially above or below that of the other anchor stores in the area (assuming similar building sizes, ages, etc.) then the rent level has to be adjusted up or down to indicate what it would be with a typical store operation. *This minimizes the possibility of giving consideration to the business value element of the going concern when only the underlying real estate is being valued*.

(Cert. Admin. R. at 241 (emphasis added).) He testified that the risk of inappropriately capturing business value is further reduced because the average level of retail sales for anchors does not vary much within a class on average:

> So when you're looking at weighted averages of the anchor stores, there's that synergy that was originally thought of when they developed these malls, and the synergy goes all the way into the anchor stores. So that differential between retail sales between a Penney's, and a Macy's, and a Dillard's, it isn't that great, and those are the type of tenants that would come to the Green Tree Mall.

(Cert. Admin. R. at 1287-88.)

The Assessor has not demonstrated how Dillard's mitigation efforts were insufficient. He has not shown that these efforts were contrary to law by pointing the

Court to any authority indicating that the methodology employed by Dillard's appraiser is inconsistent with generally recognized appraisal principles and is not adequate to alleviate the risk of inappropriately including business value. The Assessor has also not shown that the Indiana Board's acceptance of these mitigation efforts was unreasonable by pointing to any evidence in the record demonstrating that Dillard's income approach valuation actually included intangible business value. Nor has the Assessor attempted to quantify the amount of any inappropriately included business value. While it is true that the Indiana Board directly acknowledged Dillard's methodology includes "some risk of valuing the business" in addition to the underlying property, it was satisfied that the risk had been addressed, finding Dillard's "income approach as a whole to be a reliable estimate of value." (*See* Cert. Admin. R. at 1172-73 ¶¶ 66, 68.) The Indiana Board's conclusion was reasonable in light of the reasoned explanations offered by Dillard's appraiser to mitigate the inclusion of business value. Accordingly, the Court is not persuaded that the Indiana Board's determination should be overturned.

### *Dillard's Selection of a Rent-to-Retail-Sales Ratio*

The Assessor next contends that the Indiana Board's final determination was unsupported by substantial evidence because Dillard's market rent calculation was based on arbitrary data. (*See* Pet'r Reply Br. at 16.) As explained above, Dillard's appraiser developed his income approach using an industry standard ratio of rent-to-retail-sales for anchor department stores. He determined that similarly situated department stores typically agree to pay rent equal to 2% to 3% of their retail sales and concluded that a 2.5% ratio was appropriate for Dillard's property. Because the appraiser did not explain his choice of a 2.5% ratio, the Assessor argues that the choice

was arbitrary and precludes a finding that the Indiana Board's decision was supported by substantial evidence.

To prevail on his claim, the Assessor must show that a reasonable person reviewing the entire record could not find enough relevant evidence to support the Indiana Board's finding. *DeKalb Cnty. Assessor v. Chavez*, 48 N.E.3d 928, 931-32 (Ind. Tax Ct. 2016). The Indiana Board's decision will stand so long as there is more than a scintilla of evidence such that a reasonable mind might accept as adequate. *Amax Inc. v. State Bd. of Tax Comm'rs*, 552 N.E.2d 850, 852 (Ind. Tax Ct. 1990). A reviewing court may overturn a decision for lack of substantial evidence only if the agency's conclusions are shown to be clearly erroneous in light of all of the evidence. *Moriarity v. Indiana Dep't Nat. Res.*, 113 N.E.3d 614, 622 (Ind. 2019).

In this case, although the Indiana Board found the selection of the 2.5% ratio "somewhat arbitrary," its decision to rely on the ratio despite the appraiser's lack of explanation for the choice is supported by other evidence in the record. Dillard's appraiser analyzed rent-to-retail-sales ratios from eight different sources as part of the development of his income approach estimate and found that they indicated a long-established range of two to three percent of sales. (*See* Cert. Admin. R. at 232-40.) Of the eight sources, three provided an exact rent-to-retail-sales ratio, two of which the appraiser specifically noted in his testimony before the Indiana Board. (*See* Cert. Admin. R. at 1229-30.) The first source indicated a 2% ratio citing to a textbook on shopping centers published by the Appraisal Institute. (*See* Cert. Admin. R. at 232, 240.) The second indicated a ratio of 2.5% based on an average of ratios adopted in six judicial appeals by Minnesota and Illinois courts. (*See* Cert. Admin. R. at 237, 240.) The third

11

indicated a 2.45% ratio based on an average of ratios from 25 anchor store leases over the last two decades. (*See* Cert. Admin. R. at 239-40.) Taken together, this additional data reasonably supports the Indiana Board's acceptance of the appraiser's selection of a 2.5% ratio.

The Assessor points to two cases where this Court rejected unsupported choices within an estimated range. In the first case, the Court rejected an appraiser's selection of a capitalization rate at the high end of the range, which resulted in a lower property value. *Southlake Indiana, LLC v. Lake Cnty Assessor*, 181 N.E.3d 484,493 (Ind. Tax Ct. 2021) *review denied*. There, the range of capitalization rates correlated with the risk profile of the properties comprising the range. *Id*. The Court rejected the appraiser's choice because the appraiser did not explain how the taxpayer's property was similar to properties at the high end of the range. *Id*. In the second case, the taxpayer's appraiser initially prepared a sales comparison estimate using several comparable sales that yielded a value of $57 per square foot. *Marion Cnty. Assessor v. Washington Square Mall, LLC*, 46 N.E.3d 1, 11 (Ind. Tax Ct. 2015). Believing the value "didn't make sense," the appraiser then removed several comparable sales from the pool which resulted in a lower value of $37 per square foot. *Id*. (internal quotation marks omitted.) The Court rejected the appraiser's sales comparison approach because the appraiser failed to explain how the factual record supported the modification. *Id*. The Court does not find either of these two cases instructive here because, unlike in those cases, the choice here was corroborated by other reliable evidence in the record even though the exact choice itself was not explained.

Based on this factual record, the Court is not persuaded that the Assessor has met his burden here. There is sufficient evidence in the record to permit a reasonable mind to accept the selection of 2.5%. Thus, the Indiana Board's determination on this point was supported by substantial evidence.

## CONCLUSION

The Assessor has not demonstrated to the Court that the Indiana Board's final determination was contrary to law or unsupported by substantial or reliable evidence. Accordingly, the Indiana Board's final determination in this matter is AFFIRMED.