Sue Ann STINSON, in her official capacity as the Washington Township Assessor, Clinton County, and Dana Myers, in her official capacity as the Secretary of the Clinton County Property Tax Assessment Board of Appeals, Petitioners,

v.

TRIMAS FASTENERS, INC., Respondent.

No. 49T10–0702–TA–4.

Tax Court of Indiana.

March 26, 2010.

Beth H. Henkel, Robert J. Shuckit, Indianapolis, IN, Attorneys for Petitioners.

Thomas M. Atherton, David A. Suess, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Sue Ann Stinson, in her official capacity as the Washington Township Assessor, Clinton County, and Dana Myers, in her official capacity as the Secretary of the Clinton County Property Tax Assessment Board of Appeals (collectively, the Assessor) challenge the final determination of the Indiana Board of Tax Review (Indiana Board) valuing the real property of Trimas Fasteners, Inc. (Trimas) for the 2002 assessment. The issue for the Court to decide is whether the Indiana Board's final determination was improper.

## RELEVANT FACTS AND PROCEDURAL HISTORY

In 2002, Trimas owned and occupied a 200,000 square foot manufacturing facility in Frankfort, Indiana. The facility, constructed in the mid 1990's, was situated on approximately 44 acres of land.

For the 2002 assessment, the Assessor valued Trimas's property at $7,762,600. Believing that value to be too high, Trimas filed an appeal with the Clinton County Property Tax Assessment Board of Appeals (PTABOA). The PTABOA reduced the assessment to $7,212,300. Still believing its assessment to be too high, Trimas filed an appeal with the Indiana Board.

On May 24, 2006, the Indiana Board conducted an administrative hearing on the matter. During the hearing, Trimas presented an appraisal, along with the testimony of its preparer, Mr. Lawrence Mitchell, a certified member of the Appraisal Institute (MAI). Mitchell's appraisal, completed in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) estimated that, on January 1, 1999, the market value-in-use of Trimas's property was $2,960,000.[1],[2]

---

1. In Indiana, real property is assessed on the basis of its "market value-in-use." *See* IND. CODE ANN. § 6–1.1–31–6(c) (West 2002); 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (hereinafter, "Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3–1–2 (2002 Supp.)) at 2. Market value-in-use is the value "of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property." Manual at 2. A property's market value-in-use "may be thought of as the ask price of property by its owner, because this value ... represents the utility obtained from the property [ ]

In contrast, the Assessor presented an appraisal, along with the testimony of its preparer, Mr. Edward Helmer. Helmer's appraisal estimated that, on March 1, 2002, the market value-in-use of Trimas's property was $8,000,000. The Assessor also presented a copy of an appraisal, which had been prepared by Integra Realty Resources (Integra) for National City Bank, which estimated that, on July 31, 2003, the market value-in-use of Trimas's property was $8,100,000.

On January 3, 2007, the Indiana Board issued a final determination in the matter. In reviewing the competing appraisals, the Indiana Board found Mitchell's appraisal to be more probative than the Integra or Helmer appraisals because it was USPAP and it valued the property as of the proper valuation date of January 1, 1999. (*See* Cert. Admin. R. at 104 ¶¶ 40–42.) Accordingly, the Indiana Board reduced Trimas's assessment to $2,960,000.

The Assessor initiated this original tax appeal on February 16, 2007. The Court heard the parties' oral arguments on March 17, 2008. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

 The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. *Osolo Twp. Assessor v. Elkhart Maple Lane Assocs.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003). To do so, that party must demonstrate to the Court that the Indiana Board's final determination is:

and … how much utility must be replaced to induce the owner to abandon the property." *Id.*

2. Indiana's 2002 assessments were to reflect a property's market value-in-use as of January 1, 1999. *See id.* at 4.

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE ANN. § 33–26–6–6(e)(1)–(5) (West 2010). In reviewing the Indiana Board's decision, the Court will defer to the Indiana Board's factual findings (as long as they are supported by substantial evidence[3]) but will review the questions of law arising therefrom *de novo. Cedar Lake Conference Ass'n v. Lake County Prop. Tax Assessment Bd. of Appeals*, 887 N.E.2d 205, 207 (Ind. Tax Ct.2008) (citations omitted) (footnote added), *review denied.* The Court will not, however, reweigh the evidence nor will it judge the credibility of witnesses. *See Freudenberg–NOK Gen. P'ship v. State Bd. of Tax Comm'rs*, 715 N.E.2d 1026, 1030 (Ind. Tax Ct.1999) (citations omitted), *review denied.*

### Discussion

 In its final determination, the Indiana Board found that the appraisal offered by Trimas had more probative value than the appraisals offered by the Assessor. That decision deserves the highest degree of deference from this Court. *See id. See also French Lick Twp. Tr. Assessor v. Kimball Int'l, Inc.*, 865 N.E.2d 732, 739 (Ind. Tax Ct.2007) (explaining that

3. " 'Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Amax Inc. v. State Bd. of Tax Comm'rs*, 552 N.E.2d 850, 852 (Ind. Tax Ct.1990) (citation omitted).

where the Indiana Board has understood a taxpayer's evidence and determined that it has probative value, the Court will not overturn that decision absent an abuse of discretion). Against this general principle of deference, however, the Assessor now challenges the Indiana Board's evaluation of the competing appraisals.

Before addressing that challenge, it is necessary to understand why the appraisals were so different in their value estimates.[4] The reason is singular: Mitchell's appraisal concluded that Trimas's property suffered from external obsolescence, while the Helmer and Integra appraisals concluded that it did not.[5] As will be seen, those conclusions rested upon the selection and use of properties within each appraisal's sales-comparison approach to value.

According to Mitchell, Trimas's property suffered from external obsolescence because a loss of manufacturing jobs and companies within Indiana during the relevant time period saturated the market with manufacturing facilities for sale; that market, however, lacked buyers. (See Cert. Admin. R. at 273–74, 305, 827–28.) As a result, the sales prices for these facilities were low, particularly when compared to their respective replacement costs (i.e., the amount it would cost to construct facilities with similar utility).[6] That market trend, noted Mitchell, affected what Trimas's property would itself garner on the market: "[w]hen there's an oversupply and a lack of demand, to remain competitive, if your neighbor drops their price, you have to drop your price." (Cert. Admin. R. at 828.)

As evidence of this point, Mitchell's appraisal examined the sales of five manufacturing facilities (located in Muncie, Peru,

---

4. Three generally accepted appraisal techniques may be used to calculate a property's market value-in-use. See Manual at 3. More specifically:

> The first approach, known as the cost approach, estimates the value of the land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value. The second approach, known as the sales comparison approach, estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market. The third approach, known as the income approach, is used for income producing properties that are typically rented. It converts an estimate of income, or rent, the property is expected to produce into value through a mathematical process known as capitalization.

Id. (emphases omitted). In this case, all three appraisals contained a cost approach. The Integra and Helmer appraisals also contained income approaches; Mitchell's appraisal did not. (See Cert. Admin. R. at 277, 821 (where Mitchell explained that he determined the income approach was not applicable in valuing the subject property because there was insufficient data on arms-length lease transactions within the manufacturing building market over 100,000 square feet).)

5. External obsolescence is the diminishment in a property's desirability and usefulness, brought about by adverse economic/market factors. See REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002—VERSION A (2004 Reprint) (hereinafter, "Guidelines") (incorporated by reference at 50 I.A.C. 2.3–1–2), Bk. 2, Glossary at 6, 14. External obsolescence can be caused by such factors as an oversupply in the market of the type of space it provides, pollution, or inharmonious land uses. See id., App. F at 4, 13.

6. To demonstrate, Mitchell's appraisal determined that the value of Trimas's property, under the cost approach, was $8,340,000. (See Cert. Admin. R. at 294–306.) Mitchell then explained that the difference between this value and the value arrived at under the sales comparison approach represented the amount of external obsolescence present in the property. (Cf. Cert. Admin. R. at 306, 833–34 with Hometowne Assocs., L.P. v. Maley, 839 N.E.2d 269, 275 (Ind. Tax Ct.2005) (explaining that this is a proper way to quantify the amount of obsolescence in a property).)

Anderson, Franklin, and Columbia City) that occurred between January 1998 and October 2001. Mitchell explained that he used these sales because they best represented a sale of the Trimas property: they involved the transfer of a fee simple interest where the buyer and seller both used the property for general manufacturing.[7] Furthermore, given their comparability in size and location in economically similar markets, they all would have competed with the Trimas property for a buyer. (*See* Cert. Admin. R. at 265, 278–88, 819–20, 824–26, 924–26.) After adjusting the sales prices of these facilities to account for differences in factors such as dates of sale and improvement condition, Mitchell determined that they sold for between $9.29 and $19.56 per square foot. (*See* Cert. Admin. R. at 289, 824–27.) Based on these sales, Mitchell concluded that Trimas's property would have sold for approximately $14.05 a square foot on January 1, 1999 (and thus, after adding back the value of the land, the property's overall market value-in-use was $2,960,000). (*See* Cert. Admin. R. at 278–93.)

The Helmer and Integra appraisals, on the other hand, concluded that the Trimas property suffered from no external obsolescence whatsoever. In arriving at this conclusion, both appraisals examined the same six sales of industrial facilities (located in West Lafayette, Greenfield, Fishers, Lafayette, Indianapolis, and Lebanon) that occurred between June 1999 and November 2002. (*See* Cert. Admin. R. at 500–08, 581–600.) The most notable difference between these sales and those used in Mitchell's appraisal, however, was that all six sales transactions were consummated with leases in place.[8] Based on these sales transactions, both the Integra and Helmer appraisals estimated that Trimas's property would have sold for approximately $38.00 a square foot on either March 1, 2002 or July 31, 2003 (and thus, after adding back the value of the land, the property's overall market value-in-use was $8,000,000). (*See* Cert. Admin. R. at 506, 585.)

On appeal, the Assessor asserts that the Indiana Board erred in adopting Mitchell's

7. Mitchell indicated that he used the fee simple sale transactions because, as of January 1, 1999, the Trimas property "was an owner-occupied facility, fee simple. So, therefore, comparable sales should ... reflect [] the same motivations of other participants in the market that are looking for fee [] simple buildings." (Cert. Admin. R. at 819–20.)

8. No one from Integra was present at the Indiana Board hearing to testify as to the contents of its appraisal. Nevertheless, Mitchell testified that in completing a "Standard Three" USPAP review of that appraisal, he noted that the appraisal's stated purpose was to determine "the collateral value for a mortgage in regard to the sale and leaseback [] of [Trimas's property which] is an internal company transaction and not an arms [-] length sale." (*See* Cert. Admin. R. at 231–37, 436.) In addition, he noted that the comparable-sales properties used in that appraisal were all the subject of sale-leaseback transactions. (*See, e.g.,* Cert. Admin. R. at 237.)

Mitchell explained that a sale-leaseback transaction typically reflected more than the value of a property for its use: it reflected a property's investment value because the purchaser is looking for a return on the income stream generated by the lease in place at that time. (*See* Cert. Admin. R. at 923–29.) Mitchell then acknowledged that while "[t]he use of leased-fee properties in valuation of a fee-simple is not in itself wrong, [] adjustments would need to be made [in the analysis] to reflect the [different] interest transfer." (Cert. Admin. R. at 819–20.)

With respect to his appraisal, Helmer testified that he used the same comparable-sales properties as the Integra appraisal because he thought the Integra appraisal "was a good appraisal." (*See* Cert. Admin. R. at 904–06.) Furthermore, Helmer indicated that he did not independently verify the terms of those sales transactions; rather, he assumed they were all arms-length transactions. (Cert. Admin. R. at 906.)

appraisal because his value estimate "failed to comport with the legal standard of market value-in-use[.]"[9] (*See* Pet'rs Reply Br. at 8 (footnote added).) More specifically, she claims that Mitchell's conclusion that the Trimas property suffered from external obsolescence is wrong because his comparable-sales properties were all vacant when they were sold. Thus, she asserts, they did not accurately measure the market value-in-use of a property that was, in fact, being used by its owner. In other words, the Assessor maintains that to the extent a property's market value-in-use reflects the "ask price by its owner," *see supra* note 1, Trimas would clearly have asked more for its property than $2,960,000 in order to cover re-location expenses or the costs associated with the disruption of its business; an owner who, having already abandoned the property, would "take whatever he can get." (*See* Oral Argument Tr. at 8–11; Pet'rs Br. at 10, 13.) The Court disagrees.

First, while the Assessor advanced the theory that vacant properties are not com-parable to occupied properties, she presented no evidence during the administrative hearing to support that theory. (*See, generally,* Cert. Admin. R. at 774–965.) Indeed, she merely argued that Mitchell's calculation of external obsolescence was "absurd" given the fact that the comparable properties were vacant at the time of sale, and the Trimas property was not. (*See* Cert. Admin. R. at 870–71.) (*See also* Cert. Admin. R. at 882–85 (where the Assessor claims that while the value-in-use of a vacant property is just the value of the "sticks and bricks," the value-in-use of Trimas's property should be "over and above" that).) Furthermore, as evidenced by her argument, the Assessor misunderstands the concept of market value-in-use on its most basic level. Generally speaking, market value-in-use, as determined by objectively verifiable market data, is the value of a property *for* its use, not the value *of* its use.[10] *See* Manual at 2–3 (footnote added).

The Assessor also complains that in adopting Mitchell's appraisal, the Indiana

**9.** The Court notes that in its final determination, the Indiana Board excluded the Integra and the Helmer appraisals, along with certain other evidence offered by the Assessor, because the Assessor failed to comply with its rules regarding the timely exchange of evidence before an administrative hearing. (*See* Cert. Admin. R. at 70–73 ¶¶ 10–16 (citing 52 Ind. Admin. Code 2–7–1 (2004)).) On appeal, the Assessor also argues that this evidentiary ruling was an abuse of discretion because the Indiana Board lacked the statutory authority to make such a "disproportionately punitive" exclusion and, in any event, Trimas suffered no harm or prejudice as a result of her failure to comply with the rules. (*See* Pet'rs Br. at 18–28.)

The Assessor's claim is moot. Indeed, despite the fact that the Indiana Board "excluded" the Assessor's evidence, it nonetheless analyzed it and determined its probative value. (*See* Cert. Admin. R. at 91–107.) (*See also* Pet'rs Br. at 5 (where the Assessor ad-mits that despite its exclusion, the Indiana Board proceeded to analyze her evidence anyway).)

**10.** Thus, in markets where property types are frequently exchanged and used by both buyer and seller for the same general purpose, a sale will be representative of utility and market value-in-use will equal value-in-exchange. Manual at 2–3. Having said that, the Court notes that Indiana's Assessment Manual provides an "exception" to this rule with respect to "special-purpose" properties. A special-purpose property is "[a] limited-market property with unique physical design, special construction materials, or a layout that restricts its utility to the use for which it was built." Guidelines, Bk. 2, App. F at 17. Generally, a sale will not be representative of utility with respect to a special-purpose property. *See id.* Both Mitchell and Helmer agreed, however, that Trimas's property was not a special-purpose property. (*See* Cert. Admin. R. at 818–19, 823, 896.)

Board has all but ignored the possibility that market value-in-use can be determined through the use of alternative markets (i.e., sale-leaseback transactions versus fee simple transactions). (*See* Pet'rs Br. at 15.) More specifically, she argues that the Indiana Board had been "inappropriately swayed" by Mitchell's appraisal and testimony regarding the use of leased-fee transactions as comparable-sales properties: "Mitchell did not explain why using sales of the leased [-] fee interest in sale/leaseback manufacturing facilities should be ignored but simply stated in a conclusory fashion that [they] would ... 'overstate' the market value [-] in [-] use because of the buyer's motivation of purchasing an economic interest in a property 'rather than the brick and mortar.'" (Pet'rs Reply Br. at 19; Pet'rs Br. at 16.) The administrative record, however, reveals otherwise.

As indicated earlier, Mitchell did not say that leased-fee transactions could never be used to determine a property's market value-in-use. Rather, he said that they could be used if adjustments were made to reflect the different interests transferred. *See supra* note 8. In turn, the Indiana Board did not hold that leased-fee transactions could not be used to determine a property's market value-in-use. (*See* Cert. Admin. R. at 105–06 ¶¶ 46–47.) Rather, it held that given Mitchell's testimony that leased-fee transactions typically reflected more than a property's market value-in-use, it was necessary for the Assessor to explain why "properties with long-term leases [were actually more] comparable to the subject property, which had no lease in place on the valuation date[,]" than properties that sold in fee-simple transactions. (Cert. Admin. R. at 105–06 ¶ 47.) Consequently, the Indiana Board did not ignore the Assessor's evidence; it simply found Trimas's evidence to be more persuasive.[11]

## CONCLUSION

The valuation of property is the formulation of an opinion; it is not an exact science. When there are competing opinions as to how a property should be valued, the Indiana Board must determine which opinion is more probative. That determination is, essentially, the result of how effectively each party has persuaded the Indiana Board that its value opinion is more credible and reliable than that of the other. Here, the Indiana Board found that Trimas's appraisal was more persuasive than the appraisals offered by the Assessor.[12] Based on its review of evidence in the administrative record, the Court does not disagree. Consequently, the Indiana Board's final determination is AFFIRMED.

---

**11.** While the Assessor submitted a photocopied page from the *Appraisal of Real Estate* stating that "[i]nvestment value may coincide with market value ... if the client's investment criteria are typical of investors in the market[,]" (*see* Cert. Admin. R. at 719), there was no accompanying explanation (either by her or Helmer) why the leased-fee properties were more comparable than Mitchell's fee-simple properties or whether the investors who purchased the leased-fee properties were motivated by the investment criteria typical to the market. (See Cert. Admin. R. at 842–44, 863–65, 894–907.) Given this lack of expla-

nation, there is little question as to why the Indiana Board found Mitchell's appraisal more persuasive on this point than the Integra and Helmer appraisals.

**12.** The Court notes that both parties presented other evidence during the Indiana Board hearing which they claimed reinforced the validity of the value estimates contained in their respective appraisals. Because the disposition of this case turns on the probative value of the appraisals themselves, a discussion as to that other evidence is unnecessary.