ATTORNEY FOR PETITIONER[1]:

ATTORNEYS FOR RESPONDENTS:
**PAUL M. JONES, JR.**
**MATTHEW J. EHINGER**
ICE MILLER, LLC
Indianapolis, IN

_____

# IN THE
# INDIANA TAX COURT

_____

MARION COUNTY ASSESSOR,  )
                         )
    Petitioner,          )
                         )
        v.               )  Cause No. 49T10-1211-TA-00076
                         )
SIMON DEBARTOLO GROUP, LP,  )
DEBARTOLO REALTY PARTNERSHIP, LP,  )
and SPG LAFAYETTE SQUARE, LLC,  )
                         )
    Respondents.         )

FILED
Apr 08 2016, 3:01 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

_____

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA BOARD OF TAX REVIEW

_____

**FOR PUBLICATION**
**April 8, 2016**

WENTWORTH, J.

This case examines whether the Indiana Board of Tax Review erred when it reduced the Respondents' real property assessments for the 2006 and 2007 tax years. Upon review, the Court finds that the Indiana Board did not err.

_____

[1] Effective December 23, 2015, the Marion County Assessor's attorney, John C. Slatten, withdrew his appearance in this case. As of the date of this opinion, the Assessor has not informed the Court that it has retained new counsel.

**FACTS AND PROCEDURAL HISTORY**

The subject property, Lafayette Square Mall, is located on the northwest side of Indianapolis. At the time the Mall was constructed in 1968, it was the first enclosed mall in Indiana and one of the largest midwestern shopping centers outside of Chicago. (See Cert. Admin. R. at 624.)

In 2006 and 2007, the Mall was owned by Simon DeBartolo Group, LP; DeBartolo Realty Partnership, LP; and SPG Lafayette Square, LLC; all three were a part of the Simon Property Group (collectively, "Simon"). (See, e.g., Cert. Admin. R. at 3, 7, 38, 42, 624, 1498.) In December of 2007, however, Simon sold the Mall to the Ashkenazy Acquisition Corporation for $18,000,000. (See Cert. Admin. R. at 734-869, 1490-91, 1506.)

At the time of that sale, Simon had already initiated an administrative appeal challenging the Mall's 2006 assessed value of $56,341,000. (See, e.g., Cert. Admin. R. at 6, 9, 531 ¶ 2.) While that appeal was pending with the Marion County Property Tax Assessment Board of Appeals (PTABOA), Simon initiated another administrative appeal challenging the Mall's 2007 assessment.[2] (See, e.g., Cert. Admin. R. at 531 ¶ 2.) On November 24, 2009, the PTABOA reduced the Mall's 2006 assessment to $28,000,100 and on January 27, 2010, the PTABOA reduced the Mall's 2007 assessment to $20,000,000. (See, e.g., Cert. Admin. R. at 6, 531 ¶ 2, 534-35 ¶¶ 11-12.) Believing those values were still too high, Simon pursued its appeals with the Indiana Board.

In July of 2012, the Indiana Board conducted a hearing on Simon's appeals. During that hearing, Simon presented testimonial evidence explaining that in the spring

---

[2] It is not readily apparent from the certified administrative record what the Mall's initial assessed value was for 2007.

of 2007, it began to market the Mall for sale because it was suffering from vacancy and leasing issues and the property no longer fit Simon's strategic investment mission. (See, e.g., Cert. Admin. R. at 1485, 1493-94, 1496, 1505, 1507-08, 1554-57.) To facilitate the sale, Simon hired a third-party broker to oversee the distribution of marketing materials to a targeted group of potential buyers. (See Cert. Admin. R. at 621-733, 1485-87.) In the fall of 2007, Simon made a call for offers amongst those potential buyers; on December 27, 2007, Simon closed on the Mall's sale with the highest bidder, Ashkenazy. (See Cert. Admin. R. at 1488, 1490-91.) (See also generally Cert. Admin. R. at 734-869.)

Simon also presented an analysis prepared by Sara Coers, a certified general appraiser and an MAI (the Coers Analysis). (See, e.g., Cert. Admin. R. at 870-71, 897, 1499-1501.) The Coers Analysis independently verified the terms of the Mall's sale and concluded that it had been consummated in an arm's-length transaction. (See Cert. Admin. R. at 875-79 (explaining, among other things, that the Mall had been exposed in the open market for an adequate period of time; that there was no relationship between Simon and Ashkenazy; that as buyer and seller, Ashkenazy and Simon were knowledgeable and typically motivated parties to the sale; and that there were no reported special concessions or financing that affected the terms of the sale), 1504-14, 1650-52.) Moreover, based upon an examination of certain economic data,[3] the Coers

---

[3] For example, Coers examined changes that occurred between January 2005 and December 2007 in a) the capitalization rates applicable to sales of regional malls, b) the cost of consumer goods and services, and c) the cost to construct real property improvements. (See Cert. Admin. R. at 880-92.) This data was contained in various sources including the Real Estate Research Corporation's "Real Estate Report," PricewaterhouseCooper's "Korpacz Real Estate Investor Survey," the Consumer Price Index, and the Marshall & Swift Valuation Service. (See Cert. Admin. R. at 880-92, 1516-22.)

Analysis developed trending factors that Simon could use to relate the Mall's December 2007 sales price of $18,000,000 to the appropriate valuation dates for the 2006 and 2007 assessments. (See Cert. Admin. R. at 880-93, 899, 1515-22.) See also 50 IND. ADMIN. CODE 21-3-3(b) (2006) (see http://www.in.gov/legislative/iac/) (indicating that prior to 2010, a property's March 1 assessment was to reflect its market value-in-use on January 1 of the preceding year) (repealed 2010). In applying the trending factors to the $18,000,000 sales price, Simon maintained that the Mall's 2006 assessment should have been $15,281,398 and its 2007 assessment should have been $16,849,758. (See Cert. Admin. R. at 899.)

In response, the Assessor challenged certain aspects of Simon's evidence. Specifically, the Assessor, through his deputy, claimed that

1) the Mall's December 2007 sale might not have been an arm's-length transaction because "it seem[ed] to have sold pretty quickly" despite the fact that it was such a risky (i.e., poorly performing) property;

2) the Mall's performance declined gradually over time, and therefore logically the Mall would have been worth more, not less, prior to the sale;

3) the trending factors contained in the Coers Analysis were not calculated properly; and

4) the Mall's $18,000,000 sales price could not have reflected its 2006 and 2007 market value-in-use because Ashkenazy was using the Mall differently than Simon had.

(See generally Cert. Admin. R. at 1566-1602.) As better evidence of the Mall's value, the Assessor's deputy submitted an income approach[4] that she prepared valuing the

---

[4] The income approach "converts an estimate of income, or rent, [a] property is expected to produce into value through a mathematical process known as capitalization." 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (Manual) (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2- (2002 Supp.)) at 3.

Mall at $34,600,000 for 2006 and $30,800,000 for 2007. (See Cert. Admin. R. at 1251-52, 1570-71, 1592-98.)

The Indiana Board issued its final determination on October 3, 2012. In it, the Indiana Board explained that the Mall's December 2007 sales price of $18,000,000 was the best indication of its market value as of that date. (See Cert. Admin. R. at 545 ¶ 25.) Thus, to the extent Simon "presented sufficient evidence that the [Mall] was sold in a valid, arms' length [sic.] transaction and [it] trended the sale price to the relevant valuation dates[,]" the Indiana Board found that Simon's evidence established a prima facie case that its 2006 assessment should have been $15,281,398 and its 2007 assessment should have been $16,849,758. (Cert. Admin. R. at 545 ¶ 25.) The Indiana Board also explained why the Assessor's evidence failed to rebut Simon's prima facie case: 1) his deputy ultimately conceded that the time frame in which the Mall sold was reasonable; 2) his own evidence indicated that the Mall's performance – as shown through its occupancy and income levels – while poor, was nonetheless stable in the years leading up to the December 2007 sale; 3) his deputy erroneously relied on the Mall's actual income and expenses instead of market income and expenses in performing her income approach valuation; and 4) his deputy failed to provide any support for the capitalization rates she used in her income approach valuation. (See Cert. Admin. R. at 546-548 ¶¶ 27, 29-31.)

The Assessor initiated this original tax appeal on November 19, 2012. The Court conducted oral argument on October 3, 2013. Additional facts will be supplied when necessary.

**STANDARD OF REVIEW**

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2016).

**ANALYSIS**

On appeal, the Assessor maintains that the Indiana Board's final determination must be reversed because it is not in accordance with the law. He also contends that the Indiana Board's final determination constitutes an abuse of discretion as it is not supported by substantial or reliable evidence.

**I.**

The Assessor claims that the Indiana Board's final determination must be reversed because it is not in accordance with the law. (Pet'r Br. at 7.) The Assessor's entire argument supporting this claim is as follows:

> The 2002 Real Property Assessment Manual defines "true tax value" of real property as "the market value[-]in[-]use of a property for its current use, as reflected by the utility received by the owner or similar user from the property." The value if purchased for a use different from the current use by a purchaser that is not similar to the owner, is not in accordance with the law.

6

(Pet'r Br. at 7 (citation omitted).) The Assessor's claim and argument, however, warrant no attention from the Court. See, e.g., Crystal Flash Petroleum, LLC v. Indiana Dep't of State Revenue, 45 N.E.3d 882, 886 n.7 (Ind. Tax Ct. 2015) (indicating that the Court will not resolve an issue when its proponent fails to provide sufficient legal analysis); Scopelite v. Dep't of Local Gov't Fin., 939 N.E.2d 1138, 1145 (Ind. Tax Ct. 2010) (explaining that when a litigant fails to provide any citations to evidence contained in the certified administrative record as factual support for his argument, the argument is waived as the Court does not bear the burden of searching the administrative record to make his case for him); U.S. Fid. & Guar. Ins. Co. v. Hartson-Kentucky Cabinet Top. Co., 857 N.E.2d 1033, 1038 (Ind. Ct. App. 2006) (stating that when a party presents no cogent argument to support its assertion, the assertion is waived).

## II.

Next, the Assessor argues that the Indiana Board's final determination must be reversed because it constitutes an abuse of discretion. (See Pet'r Br. at 3.) More specifically, he argues that Indiana Board erred in determining that the Mall's sales price and the Coers Analysis were probative in establishing that the Mall's assessed value should be reduced. (See Pet'r Br. at 3-6; Pet'r Reply Br. at 1-6.) To demonstrate an abuse of discretion, the Assessor must show the Indiana Board either misinterpreted the law or acted clearly against the logic and effect of the facts and circumstances before it when it relied on the Mall's sales price and the Coers Analysis to reduce the Mall's assessed value. See Hubler Realty Co. v. Hendricks Cnty. Assessor, 938 N.E.2d 311, 315 n.5 (Ind. Tax Ct. 2010).

7

**A.**

The Assessor claims the Indiana Board erroneously relied upon the Mall's December 2007 sales price to support a reduction in its 2006 and 2007 assessments for two reasons. First, he argues that the Mall's 2007 sales price is "too remote from either valuation date of January 1, 2005 or January 1, 2006 to be considered relevant." (Pet'r Br. at 3.) The Assessor also argues that Simon failed to prove that the sale "[was] representative of the market." (Pet'r Reply Br. at 2.)

**1.**

For purposes of real property assessment in Indiana, valuation dates and assessment dates have not always coincided. See, e.g., IND. CODE § 6-1.1-1-2 (2006) (indicating that Indiana property is assessed on March 1st); 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) (Manual) (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.)) at 4, 8 (indicating that for the 2002 through 2005 assessments, property was to be valued as of January 1, 1999); 50 I.A.C. 21-3-3(b) (indicating that for the 2006 through 2009 assessments, property was to be valued as of January 1 of the immediately preceding year).[5] Moreover, a taxpayer's opportunity to present evidence to the Indiana Board with respect to his assessment challenge occurs well after the contested assessment date. See, e.g., Marion Cnty. Assessor v. Gateway Arthur, Inc., 45 N.E.3d 876, 878 (Ind. Tax Ct. 2015) (indicating that while the taxpayer challenged its 2006 assessment, the Indiana Board did not conduct a hearing on the matter until 2012); Shelby Cnty. Assessor v. CVS Pharmacy, Inc. #6637-02, 994 N.E.2d

---

[5] But see IND. CODE § 6-1.1-4-4.5(f) (2010) (indicating that beginning in 2010, a property's assessment date and valuation date would coincide on March 1st of the same year) and IND. CODE § 6-1.1-2-1.5 (2014) (indicating that beginning in 2016, a property's assessment date and valuation date would coincide on January 1st of each year).

350, 351 (Ind. Tax Ct. 2013) (indicating that while the taxpayer challenged its 2007 and 2008 assessments, the Indiana Board did not conduct a hearing on those matters until 2011); Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 497 (Ind. Tax Ct. 2010) (indicating that while the taxpayer challenged its 2002 assessment, the Indiana Board did not conduct a hearing on the matter until 2006); O'Donnell v. Dep't of Local Gov't Fin., 854 N.E.2d 90, 92 (Ind. Tax Ct. 2006) (indicating that while the taxpayer challenged his 2002 assessment, the Indiana Board did not conduct a hearing on the matter until 2004).  Given these "time gaps," this Court has long recognized that in assessment challenges, taxpayers can present evidence of present-day property values as long as they attempt to relate that evidence to the appropriate valuation and assessment dates.  See, e.g., O'Donnell, 854 N.E.2d at 95.  Thus, the Assessor's claim that the Mall's December 2007 sales price should have been dismissed out-of-hand as "too remote" fails.

**2.**

The Assessor also complains that the Indiana Board erred in reducing the Mall's assessments on the basis of that "one sale without evidence that the sale is representative of the market."  (Pet'r Reply Br. at 2.)  This argument, however, contradicts the guidance in Indiana's Property Assessment Manual that states that

A property's market value is

[t]he most probable price (in terms of money) which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

9

- The buyer and seller are typically motivated;
- Both parties are well informed or advised and act in what they consider their best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash or in terms of financial arrangements comparable thereto;
- The price is unaffected by special financing or concessions.

Manual at 10 (emphasis added).

The administrative record in this case reveals that Simon presented evidence indicating that it sold the Mall to Ashkenazy for $18,000,000 in a transaction where: both the buyer and the seller were typically motivated, well-informed, and acted in their own best interests; the Mall was exposed on the open market for a reasonable period of time; the payment for the Mall was made in terms of cash or a comparable arrangement; the Mall's sales price was unaffected by any special financing or concessions; and Ashkenazy purchased the Mall with the intent to continue operating it as a mall. (See, e.g., Cert. Admin. R. at 621-869, 875-79, 1492, 1504-14, 1566-1643, 1650-52.) Thus, Simon made a prima facie case that the Mall's December 2007 sales price was representative of the market because the sale met all the conditions requisite to a fair sale as indicated by Indiana's Property Assessment Manual. See Manual at 10.

At this point, it became incumbent upon the Assessor to submit evidence to the Indiana Board that demonstrated either a) the Mall's sale was not consummated in an arm's-length transaction or b) other comparable properties were selling for more than $18,000,000. See, e.g., Lake Cnty. Prop. Tax Bd. of Appeals v. St. George Serbian Orthodox Church, 905 N.E.2d 536, 539 n.4 (Ind. Tax Ct. 2009). The Assessor failed to do so, and as a result, he failed to rebut Simon's prima facie case as to this issue.

**B.**

Next, the Assessor claims it was improper for the Indiana Board to rely upon the Coers Analysis to support a reduction in the Mall's 2006 and 2007 assessments. More specifically, the Assessor explains that the Coers Analysis did not properly relate the Mall's December 2007 sales price to the appropriate valuation dates because his evidence demonstrated that: 1) the Mall declined in value between January 2005 and December 2007, 2) the trending factors contained in the Coers Analysis had no relevance to the Mall's value; and 3) the trending factors were applied to the Mall's sales price by Simon's attorney and not by an appraiser. (See Pet'r Br. at 4-6; Pet'r Reply Br. at 5-6.)

**1.**

The Indiana Board stated in its final determination that the Assessor's evidence showed that the Mall's occupancy and income levels were stable in the years immediately leading up to the sale.[6] (See Cert. Admin. R. at 546 ¶ 29.) Thus, it was reasonable for the Indiana Board to conclude that the Mall's value in the years immediately preceding its December 2007 sale would not have been any greater than at the time of its sale.

On appeal, however, the Assessor explains that the Indiana Board's conclusion relied on the income and occupancy figures he presented "for the [M]all as a whole[ and that] included parcels which were not included in the sale[.]" (Pet'r Br. at 4-5.) He

---

[6] The Indiana Board stated that the Assessor's evidence showed that the "Mall's total occupancy was reported to be 61% on March 1, 2006, 59% on March 1, 2007, and 60% in October of 2007. Similarly, the [Assessor's] evidence shows that the [M]all's total income was $7,912,283 on March 1, 2006, $7,943,392 on March 1, 2007, and $7,918,947 in October of 2007." (Cert. Admin. R. at 546 ¶ 29 (referring to Cert. Admin. R. at 1449).)

argues that the Indiana Board should have relied instead on the income and occupancy figures that his deputy presented for the "developer's portion" of the Mall, which indicated that the Mall did in fact decline in value between January 2005 and December 2007. (See Pet'r Br. at 4-5 (citing Cert. Admin. R. at 1588-91).) Indeed, his deputy specifically stated during the Indiana Board hearing that:

> from what the rent rolls tell me, at 01-01-05, the total center occupancy was 65 percent. 01-01-06 it was 62. 03-01-06 it was 61. 03-01-07 it was 59. Around the sale date it was 60. A little decline, somewhat stable. But if you look at the developer's portion, which was the portion that sold, which excludes the Sears, the Ayres improvements, because Ayres own their own, and the Michael's Tire Improvements, which is also owned by the tenant, the developer's square footage was 49 percent occupied at 01-01-05, 44 percent 01-01-06, 43 percent 03-01-06, 39 percent 03-01-07, and 41 percent in October of '07, right around the sale date. I mean that clearly shows to me a decline as well as the overall rents. On an average for the whole center of developer's portion, January 1 of '05 of $10.85 a square foot, 01-01-06 $10.81 a foot, 3-01-06 $10.45 a foot, 03-01-07 is $10.57 a foot, and in October of '07 $10.48 a foot. That tells me you've got serious decline.

(Cert. Admin. R. at 1589-90.) (See also Cert. Admin. R. at 1449.)

The Assessor's argument does not account for the fact that his deputy did not identify, let alone provide, evidence substantiating that the Sears store, the Ayres store, and the tire store were not included in the Mall's sale. This is fatal to the Assessor's argument because there is documentary evidence in the administrative record that clearly indicates that both the Ayres (Macy's) store and the tire store were included in the Mall's sale to Ashkenazy. (See, e.g., Cert. Admin. R. at 624, 631, 652, 1535.) Thus, the Assessor did not establish that there was a decline in the Mall's value between January 2005 and December 2007.

**2.**

The Assessor also contends that the Indiana Board should have rejected the Coers Analysis because its trending factors were not properly developed.  Specifically, he states:

> [the trending factors were computed] based on [information contained in] national surveys and other sources that have no relevance to the value of the . . . Mall.  The important determinants of value such as traffic, sales volume, and economic conditions in the proximate vicinity of the [M]all were considered in the trending analysis.  Accordingly, the trending [factors] do not constitute probative evidence.

(Pet'r Reply Br. at 6.)  (See also Pet'r Br. at 5 (stating that the trending factors were derived from "a compilation of numerous indexes [sic.] including some with no relevance to mall values, such as the Consumer Price Index").)

While the Assessor has complained about the method used to calculate the trending factors, he has provided no authoritative sources to either the Indiana Board or this Court that explain how trending factors should be calculated.  Accordingly, he has failed to show that the trending factors contained in the Coers Analysis were not properly calculated.

**3.**

During the Indiana Board hearing, Coers testified that while she was engaged by Simon to confirm the terms of the Mall's sale and to develop trending factors, she was not engaged to perform an appraisal of the Mall.  (See, e.g., Cert. Admin. R. at 1503-04, 1527-30.)  Accordingly, as a certified general appraiser subject to USPAP, she could not – and would not – render any independent opinion as to the value of the Mall or whether the $18,000,000 represented the value of the Mall.  (Cert. Admin. R. at 874,

13

1530.)  She also determined that the terms of her engagement did not include applying the trending factors "to any price or value [of the Mall]" because that would ultimately result in her rendering a value for the Mall.  (Cert. Admin. R. at 874, 1527-28.)

Now, on appeal, the Assessor explains that because Coers "was unwilling or unable" to render a value for the Mall, Simon's attorney was "the only person who was willing to contend that the [Mall's $18,000,000] sale[s] price adjusted by the trending factors was [its] market value[-]in[-]use."  (Pet'r Br. at 5-6.)  The Assessor complains, however, that Simon's attorney "was not sworn in as a witness, he made no attestation that his computations conformed to USPAP or were otherwise reliable, and he was acting in the capacity of an advocate."  (Pet'r Br. at 6.)  As a result, the Assessor asserts that the Indiana Board's final determination constitutes an abuse of discretion.  (Pet'r Br. at 6.)

During the Indiana Board hearing, Simon maintained that the Mall's 2006 and 2007 assessment values should have been the $18,000,000 sales price as adjusted by the appropriate trending factors contained within the Coers Analysis.  (See Cert. Admin. R. at 1481-82.)  To that end, Simon's attorney presented, as demonstrative evidence, a piece of paper that simply "did the math."  (See Cert. Admin. R. at 899, 1522-23.)  The Assessor has provided no legal authority for his proposition that the actions of Simon's attorney rendered an opinion of value subject to USPAP or that he needed to be sworn in as a witness.  In fact, during the Court's oral argument, the Assessor's counsel conceded that if the trending factors were reliable, then "anybody" – including Simon's attorney – could have done the math.  (See, e.g., Oral Arg. Tr. at 27-29.)  Because the

14

Assessor did not demonstrate that the trending factors were improperly developed, <u>see</u> <u>supra</u> at 13, the Court need not address this issue any further.

**CONCLUSION**

The Assessor has not met his burden in demonstrating that the Indiana Board's final determination is contrary to law or constitutes an abuse of discretion, as his arguments on appeal are unpersuasive and often incoherent, rife with open-ended questions, and lack citations to either facts in the administrative record or to legal authority. (<u>See</u> Pet'r Br.; Pet'r Reply Br.; Oral Argument Tr. at 3-48.) Accordingly, the Indiana Board's final determination in this matter is therefore AFFIRMED.