ATTORNEYS FOR PETITIONER:
**MARILYN S. MEIGHEN**
ATTORNEY AT LAW
Carmel, IN

**BRIAN A. CUSIMANO**
ATTORNEY AT LAW
Indianapolis, IN

ATTORNEY FOR RESPONDENT:
**PAUL M. JONES, JR.**
PAUL JONES LAW, LLC
Indianapolis, IN



FILED

Sep 07 2016, 12:49 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

HOWARD COUNTY ASSESSOR, )
)
    Petitioner, )
)
          v. )    Cause No. 49T10-1502-TA-00004
)
KOHL'S INDIANA LP, )
)
    Respondent. )

## ON APPEAL FROM A FINAL DETERMINATION OF
## THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**September 7, 2016**

WENTWORTH, J.

On December 31, 2014, the Indiana Board of Tax Review issued a final determination valuing the Kohl's store in Kokomo, Indiana for purposes of the 2010, 2011, and 2012 assessments. The Howard County Assessor has challenged that final determination, but the Court affirms.

**RELEVANT FACTS AND PROCEDURAL HISTORY**

Kohl's Indiana LP owns and occupies an 88,242 square foot retail store on 10.65

acres of land at the Boulevard Crossing shopping center in Kokomo, Indiana (the subject property). Kohl's constructed the subject property in 2003.

For the 2010, 2011, and 2012 assessments, the Assessor valued the subject property at $5,984,000, $5,685,300, and $5,906,300 respectively. Believing those values to be too high, Kohl's filed appeals with the Howard County Property Tax Assessment Board of Appeals (PTABOA). The PTABOA affirmed the assessments and Kohl's subsequently filed appeals with the Indiana Board. After consolidating the three appeals, the Indiana Board conducted an administrative hearing on the matter in January of 2014.

During the hearing, both Kohl's and the Assessor presented, among other things, Summary Appraisal Reports, completed by certified appraisers in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP), that valued the subject property for each of the assessment years at issue. The Kohl's appraisal, which employed the sales comparison, the income, and the cost approaches to value, estimated the subject property's market value-in-use to be $3,690,000 for the 2010 assessment; $3,820,000 for the 2011 assessment; and $3,680,000 for the 2012

assessment.[1]  The Assessor's appraisal, on the other hand, employed the sales comparison and the cost approaches to value and estimated the subject property's market value-in-use to be $4,920,000 for the 2010 assessment, $4,770,000 for the 2011 assessment, and $4,810,000 for the 2012 assessment.

On December 31, 2014, the Indiana Board issued a final determination in the matter, stating that the two parties "fundamentally disagreed" about how the subject property should be appraised due to their differing interpretations of Indiana's market value-in-use standard.  (See Cert. Admin. R. at 55 ¶ 1.)  Their disagreement, the Indiana Board explained, was demonstrated through their selection of different comparable properties used in each of their appraisals.  For instance, in valuing the subject property, the Kohl's appraisal relied on data from the fee simple sales of nine midwestern "big box" retail stores.[2]  (See Cert. Admin. R. at 63 ¶¶ 24, 26.)  The appraiser for Kohl's believed these properties were appropriate comparables to use in

---

[1] Three generally accepted appraisal techniques may be used to calculate a property's market value-in-use:

> The first approach, known as the cost approach, estimates the value of the land as if vacant and then adds the depreciated cost new of the improvements to arrive at a total estimate of value.  The second approach, known as the sales comparison approach, estimates the total value of the property directly by comparing it to similar, or comparable, properties that have sold in the market.  The third approach, known as the income approach, is used for income producing properties that are typically rented.  It converts an estimate of income, or rent, the property is expected to produce into value through a mathematical process known as capitalization.

2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.)) at 3 (emphases omitted); 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (see http://www.in.gov/legislative/iac/)) at 2 (emphases omitted).

[2] "A 'big box property' is any free standing building in excess of 50,000 square feet with minimal interior divisions that is used for retail purposes."  Meijer Stores Ltd. P'ship v. Smith, 926 N.E.2d 1134, 1137 n.6 (Ind. Tax Ct. 2010).

valuing the subject property because: 1) they were vacant at the time of the sale and thus their sales prices reflected the value of the real property alone (as opposed to intangible values, such as tenant quality, that are often included in the sale of leased fees); 2) they all sold for a continued retail use; and 3) similar big box properties were regularly sold in the market. (See Cert. Admin. R. at 63-64 ¶¶ 24-28, 75 ¶ 67.)

In contrast, the Indiana Board noted that the Assessor's appraiser believed that the use of the "dark boxes" by Kohl's was not appropriate to value the subject property for the following reasons: 1) dark boxes do not have any utility to either the original owner or another owner/user "in the same retail tier" and 2) the subject property was a special purpose property because Kohl's built it to its own specifications. (See, e.g., Cert. Admin. R. at 70-71 ¶¶ 50, 53, 73 ¶ 59, 82-83 ¶¶ 89, 92-93.) Accordingly, by using the dark boxes as comparables, the Assessor's appraiser claimed that Kohl's had determined the subject property's market value rather than its market value-in-use.[3] (See Cert. Admin. R. at 82 ¶ 89, 88-89 ¶ 110.) The Assessor's appraisal relied instead on data from sales of big boxes with leases to either Kohl's or another "first generation" user that were in place at the time of the sale (i.e., leased fee sales). (See, e.g., Cert. Admin. R. at 82 ¶ 89, 84 ¶ 95, 87-89 ¶¶ 107, 110 (contending that because the subject property is an operating Kohl's store, the value of its utility could best be determined in relation to other operating Kohl's stores).)

After weighing the competing appraisals, the Indiana Board found the one submitted by Kohl's more probative than the one submitted by the Assessor because it

---

[3] For instance, the Assessor asserted that a retailer that purchases a dark box – i.e., a secondary or "second-generation" user – needs to invest a significant amount of money beyond the purchase price to adapt the building to its own business model and thus create utility. (See Cert. Admin. R. at 73-74 ¶ 60, 82-83 ¶ 91, 87-88 ¶ 107.)

better reflected the meaning of market value-in-use as stated in Indiana's assessment manual and as consistently interpreted in Tax Court jurisprudence. (See Cert. Admin. R. at 55-56 ¶ 1, 91-92 ¶¶ 117-19, 107 ¶ 160.) Indeed, the Indiana Board explained that pursuant to Tax Court case law, "where a non-special purpose property is put to its highest and best use and is of a type that regularly exchanges for the same general use, the property's [market value-in-use] will equal its market value." (Cert. Admin. R. at 94 ¶ 124 (citing Meijer Stores Ltd. P'ship v. Smith, 926 N.E.2d 1134 (Ind. Tax Ct. 2010); Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496 (Ind. Tax Ct. 2010); Millennium Real Estate Inv., LLC v. Assessor, Benton Cnty., 979 N.E.2d 192 (Ind. Tax Ct. 2012), review denied).) After reviewing the evidence presented, the Indiana Board found that because the Assessor 1) acknowledged that properties like the subject property frequently trade in the market for a general retail use, 2) indicated that the subject property's current use was its highest and best use, and 3) failed to demonstrate that the subject property was in fact a special purpose property, the Kohl's appraisal better reflected the subject property's market value-in-use. (See Cert. Admin. R. at 83 ¶ 93, 94-97 ¶¶ 124, 126-31.) (See also Cert. Admin. R. at 97 ¶ 132 (explaining that the Assessor's appraisal measured the value of a property that was better than, and not similar to, the subject property because it included the costs to adapt the dark box to meet the specific business model of Kohl's).) Accordingly, the Indiana Board reduced the subject property's 2010 assessment to $3,690,000; the 2011 assessment to $3,820,000; and 2012 assessment to $3,680,000.

The Assessor initiated this original tax appeal on February 13, 2015. The Court heard the parties' oral arguments on January 15, 2016. Additional facts will be supplied

as necessary.

## STANDARD OF REVIEW

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Accordingly, the Assessor must demonstrate to the Court that the Indiana Board's final determination in this matter is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of or short of statutory jurisdiction, authority, or limitations; without observance of procedure required by law; or unsupported by substantial or reliable evidence. See IND. CODE § 33-26-6-6(e)(1)-(5) (2016).

## LAW

Indiana's Constitution does not require a system of property assessment and taxation based exclusively on market value. Boehm v. Town of St. John, 675 N.E.2d 318, 328 (Ind. 1996). And, while the Legislature has provided that Indiana assesses and taxes property on the basis of its "true tax value" and that "true tax value does not mean fair market value[,]" it has left it to the Department of Local Government Finance (DLGF) to determine what "true tax value" should mean. See IND. CODE § 6-1.1-31-6(c) (2016).

The DLGF has promulgated regulations stating that a property's true tax value is its "market value-in-use." 2002 REAL PROPERTY ASSESSMENT MANUAL (2004 Reprint) ("2002 Manual") (incorporated by reference at 50 IND. ADMIN. CODE 2.3-1-2 (2002 Supp.)) at 2; 2011 REAL PROPERTY ASSESSMENT MANUAL ("2011 Manual") (incorporated

6

by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011) (see http://www.in.gov/legislative/iac/)) at 2. Market value-in-use, in turn, is defined as the value "of a property for its current use, as reflected by the utility received by the owner or a similar user, from the property." 2002 Manual at 2. Accord 2011 Manual at 2. Because Indiana's property tax system taxes the value of real property – and not business value, investment value, or the value of contractual rights – this Court has explained that "market value-in-use, as determined by objectively verifiable market data, is the value of a property for its use, not the value of its use." Trimas Fasteners, 923 N.E.2d at 501 (citation omitted). See also IND. CODE § 6-1.1-1-15 (2016) (stating what constitutes "real property" for purposes of assessment).

Most of the time, a property's market value-in-use will be equivalent to its market value; nonetheless, there are certain instances where a property's market value-in-use will not be equal to its market value.[4] See 2002 Manual at 2-4; 2011 Manual at 2. More specifically, "when a property's current use is consistent with its highest and best use[] and there are regular exchanges within its market so that ask and offer prices converge, a property's market value-in-use will equal its market value because the sales price fully captures the property's utility." Millennium, 979 N.E.2d at 196 (citing 2002 Manual at 2). See also 2011 Manual at 2. "[W]hen[, however,] a property's current use is inconsistent

---

[4] For purposes of assessment, Indiana defines "market value" as

> The most probable price (in terms of money) which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under [certain] conditions[.]

2002 Manual at 10. See also 2011 Manual at 5-6.

7

with its highest and best use, then market value-in-use will not equal market value because the sales price will not reflect the property's utility." Millennium, 979 N.E.2d at 196 (citing 2002 Manual at 2). See also 2011 Manual at 2. The DLGF has explained that the latter occurs with respect to 1) properties "where owners are motivated by non-market factors such as the maintenance of a farming lifestyle even in the face of a higher use value for some other purpose" or 2) special purpose properties.[5] 2002 Manual at 2-4; 2011 Manual at 2.

In reviewing evidence relating to the price at which a buyer would purchase real property in order to continue its current use, the Court has frequently been called upon to decide what properties, under the market value-in-use standard, are appropriate comparables for purposes of valuing a particular parcel of property. In answering that call, the Court has repeatedly interpreted the meaning of "current use" broadly, rejecting the contention that with respect to commercial and industrial properties, properties that have been sold to "secondary users" cannot be considered comparable. See, e.g., Marion Cnty. Assessor v. Washington Square Mall, LLC, 46 N.E.3d 1, 9-10 (Ind. Tax Ct. 2015) (explaining that for purposes of market value-in-use, a regional mall and a discount mall are similar uses); Shelby Cnty. Assessor v. CVS Pharmacy, Inc. # 6637-02, 994 N.E.2d 350, 354 (Ind. Tax Ct. 2013) (observing that it was proper to measure a

---

[5] A special-purpose property is "[a] limited-market property with unique physical design, special construction materials, or a layout that restricts its utility to the use for which it was built." 2002 REAL PROPERTY ASSESSMENT GUIDELINES FOR 2002 – VERSION A (2004 Reprint) ("2002 Guidelines") (incorporated by reference at 50 I.A.C. 2.3-1-2), Bk. 2, App. F at 17 (emphasis omitted). See also 2002 Manual at 4 (defining a special use/purpose property as one that is "so uniquely designed and adapted for the business conducted upon it or the use made of it and which cannot be converted to other uses without the expenditure of significant sums of money"). Examples of special purpose properties are steel mills, theaters, auditoriums, and churches. 2002 Guidelines, Bk. 2, Glossary at 19; 2011 REAL PROPERTY ASSESSMENT GUIDELINES (incorporated by reference at 50 I.A.C. 2.4-1-2), Glossary at 21.

CVS store's market value-in-use in relation to participants within the commercial/retail market generally, and not solely against other CVS stores); Grant Cnty. Assessor v. Kerasotes Showplace Theatres, LLC, 955 N.E.2d 876, 881 n.10 (Ind. Tax Ct. 2011) (rejecting the claim that in relying on an appraisal that did not use theatre properties that sold in sale-leaseback transactions as comparable properties, the Indiana Board adopted "a value 'more representative of a market value for a second generation user, not a value[-in-]use'" (citation omitted)); Meijer, 926 N.E.2d at 1137 (explaining that pursuant to the sales comparison approach, the market value-in-use of a retail property should be measured against properties with a comparable use as opposed to properties with identical users). Likewise, the Court has also disavowed the contention that vacant properties cannot be comparable to occupied properties. See Trimas Fasteners, 923 N.E.2d at 501 (rejecting the argument that while the market value-in-use of a vacant building "is just the value of [its] 'sticks and bricks,'" the market value-in-use of an occupied building "should be 'over and above' that").

**ANALYSIS**

On appeal, the Assessor asserts that the Indiana Board's final determination must be reversed. In advancing that assertion, the Assessor has not argued that the Indiana Board erred when it determined that 1) properties like the subject property frequently trade in the market for a general retail use, 2) the subject property's current use was its highest and best use, or 3) she had not demonstrated that the subject property was a special purpose property. Rather, the Assessor argues that the Indiana Board's final determination must be reversed because the Meijer, Trimas Fasteners, and Millenium cases upon which it relied were wrongly decided. Indeed, the Assessor

9

believes that, contrary to the Tax Court's holdings in those cases, the sales of properties to secondary users cannot be the type of comparables contemplated under Indiana's market value-in-use standard because they simply do not provide evidence of utility, and thus value, for the "first generation" user.[6]  (See Pet'r Br. at 7, 9-12, 14; Oral Arg. Tr. at 11, 23, 31, 44.)  (See also Pet'r Br. at 7-8 (explaining that given this "conceptual" argument, "the specifics of the various appraisals and appraisal reviews [presented to the Indiana Board need] not [be] expanded upon").)  Accordingly, the Assessor invites the Court to reconsider – and abandon – its holdings in Meijer, Trimas Fasteners, and Millenium.  (See, e.g., Oral Arg. Tr. at 4-7, 47-48.)  The Court, however, finds no infirmities in its decisions and therefore declines the Assessor's invitation on the basis of stare decisis.

As the U.S. Supreme Court recently stated:

> Overruling precedent is never a small matter.  Stare decisis – in English, the idea that today's [c]ourt should stand by yesterday's decisions – is "a foundation stone of the rule of law."  Application of that doctrine, although "not an inexorable command," is the "preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."  It also reduces incentives for challenging settled precedents, saving parties and courts the expense of endless relitigation.
>
> Respecting stare decisis [even] means sticking to some wrong decisions.  The doctrine rests on the idea . . . that it is usually "more important that the applicable rule of law be settled than it be settled right."  Indeed, stare decisis has consequence only to the extent it

---

[6] In fact, the Assessor claimed that because the Legislature believed the holdings in Meijer, Trimas Fasteners, and Millenium were "repugnant" to the intended meaning of market value-in-use, it enacted Indiana Code §§ 6-1.1-4-43 and -44.  (See Pet'r Br. at 11.)  See also IND. CODE §§ 6-1.1-4-43, -44 (2015) (repealed 2016).  The Legislature's repeal of those statutes less than a year after enacting them provides no clear indication that the Legislature intended to override the Court's decisions in those cases.

sustains incorrect decisions; correct judgments have no need for that principle to prop them up. Accordingly, an argument that [a court] got something wrong – even a good argument to that effect – cannot by itself justify scrapping settled precedent. . . . To reverse course . . . "special justification"[ is required ] – over and above the belief "that the precedent was wrongly decided."

Kimble v. Marvel Entm't, LLC, 135 S.Ct. 2401, 2409 (2015) (citations omitted). On appeal, the Assessor has done nothing more than express her disagreement with the Court's decisions in the Meijer, Trimas Fasteners, and Millenium cases. The Court, however, does not believe it "got it wrong" and therefore continues to stand by those decisions.[7]

**CONCLUSION**

For the foregoing reasons, the Indiana Board's final determination in this matter is AFFIRMED.

---

[7] The attorney for the Assessor in this case made the same argument several years ago while representing a different assessor. See Shelby Cnty. Assessor v. CVS Pharmacy, Inc. # 6637-02, 994 N.E.2d 350, 354 n.5 (Ind. Tax Ct. 2013) (noting that the assessor's "real" argument on appeal in that case was that the holdings in Meijer and Trimas Fasteners were wrong and, that in holding as it did, the Court was "impermissibly attempting to convert Indiana's market value-in-use system into a fair market value system").) Another attorney who has represented a third assessor has also made the same argument. See Marion Cnty. Assessor v. Simon DeBartolo Group, LP, 52 N.E.3d 65, 68-69 (Ind. Tax Ct. 2016); Marion Cnty. Assessor v. Washington Square Mall, LLC, 46 N.E.3d 1, 9-10 (Ind. Tax Ct. 2015). The Court rejected those arguments then as it does again today. Simon DeBartolo Group, 52 N.E.3d at 68-69; Washington Square Mall, 46 N.E.3d at 9-10; Shelby Cnty. Assessor, 994 N.E.2d at 354 n.5.

11